STAFF BUILDERS, INC., *v.* ARMSTRONG, APPELLEE; AETNA LIFE INSURANCE COMPANY, APPELLANT.

[Cite as Staff Builders, Inc. *v.* Armstrong (1988), 37 Ohio St. 3d 298.]

(No. 87-196—Submitted October 28, 1987—Decided July 6, 1988.)

*Michael P. Zirpolo* and *Stanley R. Rubin,* for appellee.

*Day, Ketterer, Raley, Wright & Rybolt, John A. Murphy, Jr.,* and *Matthew Yackshaw,* for appellant.

SWEENEY, J. The instant appeal seeks to challenge the jury award of compensatory damages for breach of contract and further seeks to challenge the jury award of compensatory and punitive damages for bad faith on the part of appellant in processing the insurance claim of appellee. At the outset, however, it is necessary to consider whether the vacation of the jury verdict by the trial court because of its perceived inconsistency with the response to the interrogatory was erroneous.

I

Civ. R. 49(B) governs the submission of interrogatories to juries and the effect, if any, the responses thereto have on the verdict. It provides:

"The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. *The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law.*

"The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict.

"When the general verdict and the answers are consistent, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. *When one or more of the answers is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial.*" (Emphasis added.)

While the text of this rule appears to allow a trial court to *sua sponte* order a new trial where the verdict and the answers to the interrogatories are inconsistent, the court of appeals below held that the authority of the trial court to do so is conditioned upon the interposition of an objection by a party to the litigation.

However, we expressly decline to resolve the issue on this basis. Rather, we conclude that the trial court erred in determining that an inconsistency existed. The interrogatory propounded by Aetna provided:

"Do you find by a preponderance of the evidence that the services rendered by Staff Builders, Inc., was [*sic*] primarily for custodial care? For purposes of answering this question, the term custodial care means care comprised of services which are provided to an individual, whether disabled or not, primarily to assist her in the activities of daily living. Such services are custodial care without regard to the practitioner or provider by whom or by which they are prescribed, recommended or performed."

In contrast, the contract of in-

surance provided an exclusion for custodial care. "Custodial care" was defined in Section 1, Article I of the contract as follows:

"(z) *The term 'custodial care' means care comprised of services and supplies,* including room and board and other institutional services, which are provided to an individual, whether disabled or not, *primarily to assist him in the activities of daily living.* Such services and supplies are custodial care without regard to the practitioner or provider by whom or by which they are prescribed, recommended or performed."

Thus, the exclusion applied only when custodial care was solely provided. "Custodial care" was defined as that service designed to assist in the performance of activities of daily living. Therefore, the jury interrogatory did not find that the care provided by SBI was custodial but, at best, primarily custodial. Inasmuch as the terms of the contract did not exclude blended services (*i.e.,* partially custodial, partially professional), this interrogatory would not apply to the facts of this case. Any answer to the interrogatory would therefore not govern a determinative issue in the case as required by Civ. R. 49(B) since an affirmative answer thereto would only mean that the jury found that blended services were provided. Since blended services are not excluded, the interrogatory is not inconsistent with the general verdict in favor of appellee.

II

Irrespective of its procedural challenge to the jury verdict, appellant contends that the award of $35,000 in compensatory damages for breach of contract was unsupported by the evidence. This argument is without merit. Article II of the contract at issue provides in relevant part:

"OTHER MEDICAL EXPENSES: The following charges are considered 'Other Medical Expenses,' provided that they have not been considered as 'Hospital Expenses':

"* * *

"(2) The charges for nursing care of a registered graduate nurse — other than a nurse who ordinarily resides in the eligible beneficiary's home, or is a member of the family of either the eligible beneficiary or the eligible beneficiary's spouse, are included as 'Other Medical Expenses' only when the care (i) is ordered by the attending physician, (ii) requires the technical proficiency and professional skills of an R.N. and (iii) if the covered family member is confined as an inpatient in the hospital, such care could not have been provided by the hospital's regular nursing staff.

"Charges for the services of a private duty Registered Nurse requested by, or for the convenience of, the covered family member or his family, which consists primarily of bathing, feeding, exercising, moving the covered family member, giving oral medication, or acting as a companion or sitter will not be included as 'Other Medical Expenses'[.]"

It is beyond dispute that Gertrude Armstrong was not a hospital inpatient at the time nursing services were provided to her. Moreover, these services were undertaken upon the express instructions of Dr. Mark Perlmutter, her personal physician. It was the expert opinion of Dr. Perlmutter that Gertrude Armstrong required skilled nursing care.

The care provided by Staff Builders reflected the skilled nature of the services provided. It was necessary that the condition of Gertrude Armstrong be monitored for any ill effects produced by the medications she was

ingesting and for the dosages to be adjusted accordingly. Moreover, Mrs. Armstrong was being administered various medications to combat the myriad physical and emotional problems that she was confronting. Three separate medications were required to address her heart condition. She was also administered an anti-coagulant to prevent a recurrence of the stroke that she had previously suffered. Additionally, an anti-depressant medication was prescribed to combat the psychological effects resulting from the stroke. A diuretic was also utilized. The interaction of these various medications required constant observation and monitoring. The testimony at trial clearly established that the regulation of dosage and the observation of adverse side effects from drug interaction required the intervention of skilled nursing professionals.

The record is replete with evidence that Gertrude Armstrong both required and received skilled nursing care while recuperating from her stroke at home. It is therefore abundantly clear that her care was encompassed within the terms of the contract of insurance and that this contract was breached when insurance benefits were denied.

### III

In the case *sub judice,* the jury returned a verdict in favor of appellee for $50,000 in additional compensatory damages. This award was predicated upon the acts of appellant in tortiously withholding insurance coverage. Appellant objects to this verdict, claiming that it is not an insurer under the policy and that, in any event, it did not wrongfully withhold insurance coverage. We disagree.

The most cursory review of the insurance agreement discloses that the appellant is identified as the insurance company and Ohio Retirement Systems is identified as the policyholder. The members of ORS are consequently third-party beneficiaries of the group policy.

Given that Aetna is the insurer for purposes of the contract, it is necessary to determine whether the jury verdict finding bad faith on the part of Aetna is sustainable. In *Hoskins* v. *Aetna Life Ins. Co.* (1983), 6 Ohio St. 3d 272, 276, 6 OBR 337, 341, 452 N.E. 2d 1315, 1320, this court stated:

"The liability of the insurer in such cases does not arise from its mere omission to perform a contract obligation, for it is well established in Ohio that it is no tort to breach a contract, regardless of motive. See, *e.g., Ketcham* v. *Miller* (1922), 104 Ohio St. 372. Rather, the liability arises from the breach of the positive legal duty imposed by law due to the relationships of the parties. See *Battista* [v. *Lebanon Trotting Assn.* (C.A. 6, 1976), 538 F. 2d 111, at 117-118]. See, also, *Saberton* v. *Greenwald* (1946), 146 Ohio St. 414 [32 O.O. 454]. This legal duty is the duty imposed upon the insurer to act in good faith and its bad faith refusal to settle a claim is a breach of that duty and imposes liability sounding in tort."

Accordingly, we hold that an insurer has a duty to act in good faith in the processing and payment of the claims of its insured. A breach of this duty will give rise to a cause of action in tort irrespective of any liability arising from breach of contract.

In *Hart* v. *Republic Mut. Ins. Co.* (1949), 152 Ohio St. 185, 188, 39 O.O. 465, 466, 87 N.E. 2d 347, 349, this court addressed the potential tort liability of an insurer for refusing to settle a claim against an insured. We observed that such refusal "may not be arbitrary or capricious * * *. The conduct of the insurer must be based on circumstances that furnish reasonable justification therefor." In *Hoskins,*

*supra,* this duty of the insurer was extended to the processing of the claims of its insured. Accordingly, it is our further determination that an insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor.

In the case at bar there appears sufficient evidence to support the jury finding of a tortious breach of this duty. As an initial matter, reference is made to the letters sent to appellee assuring her that "[n]o action is required of you at this time." These letters were sent during or about the period that nursing services were provided. Moreover, some letters were sent even after the claim had been denied. Nevertheless, Aetna essentially allowed and even encouraged the assumption of financial obligations by appellee only to deny coverage at a later date.

Second, an employee of appellant who admitted that she had no medical training recommended denial of the claim prior to any review by medical personnel as to the justification for the expenses incurred. Moreover, despite the determination by a senior claim examiner in the home office of appellant that additional medical information was necessary in order to evaluate the recommendation, the medical specialist for Aetna (Charles Scholhamer) conceded that he had not reviewed a letter sent by the attending physician of appellee (Dr. Mark Perlmutter). Nevertheless, Scholhamer also testified that such information was necessary to evaluate the claim. Another medical specialist in the employ of Aetna (Dr. Thomas Culley) testified that the claim would have been allowed if it had been known that appellee was unable to administer her own medication. Nevertheless, Dr.

Culley acknowledged that he was aware of the letter from Dr. Perlmutter which stated that appellee had suffered intellectual impairment as a result of her stroke.

Appellant further maintains that it did not act in bad faith in denying the claim of appellee because it had no financial incentive to do so. In support of this allegation, appellant states that the funds of ORS were at stake in the payment of a claim. Further, it is the contention of appellant that its "administration fee" was based upon the number of claims *allowed.* Thus, appellant claims it had a financial incentive to allow the claim.

However, appellant concedes that it is but one of various insurance companies which bid on the administrative contract with ORS. It must be presumed that ORS is interested in the financial solvency of the retirement fund. ORS is therefore cognizant of the volume of claims made against the fund. Consequently, the number of claims allowed by a particular administrator bears on its competitive position vis-a-vis other companies seeking to provide these services. Thus, it is in appellant's competitive and ultimately its financial interest to deny claims lest it be underbid by a competitor at a later date. It is therefore inaccurate to suggest that appellant had no financial incentive to deny a claim.

We therefore conclude that there was ample evidence to sustain the jury finding of bad faith in the processing of the insurance claim of appellee. It is abundantly clear that information relevant to the claim was either reviewed by persons unskilled in its evaluation or disregarded by those who possessed such skills.

IV

Similarly, appellant challenges the jury award of $125,000 in punitive

damages as being unsupported by the evidence. In *Hoskins* v. *Aetna Life Ins. Co., supra,* this court set forth the standard to be applied in determining whether an insurer is answerable in punitive damages for tortiously withholding insurance coverage. In paragraph two of the syllabus we held:

"Punitive damages may be recovered against an insurer [that] breaches [its] duty of good faith in refusing to pay a claim of its insured upon proof of actual malice, fraud or insult on the part of the insurer. (*Columbus Finance* v. *Howard,* 42 Ohio St. 2d 178 [71 O.O. 2d 174], applied.)"

The requisite conduct necessary to support an award of punitive damages is separate and distinct from that sufficient to establish bad faith on the part of the insurer for wrongfully refusing to pay a claim. In *Silberg* v. *California Life Ins. Co.* (1974), 11 Cal. 3d 452, 462-463, 113 Cal. Rptr. 711, 718, 521 P. 2d 1103, 1110, quoted in *Hoskins, supra,* the Supreme Court of California remarked:

"It does not follow that because plaintiff is entitled to compensatory damages that he is also entitled to exemplary damages. In order to justify an award of exemplary damages, the defendant must be guilty of oppression, fraud, or malice. * * * While we have concluded that defendant violated its duty of good faith and fair dealing, this alone does not necessarily establish that defendant acted with the requisite intent to injure plaintiff."

Actual malice is defined as " ' "that state of mind under which a person's conduct is characterized by hatred or ill will, a spirit of revenge, retaliation or a determination to vent his feelings upon other persons." ' " *Columbus Finance, Inc.* v. *Howard* (1975), 42 Ohio St. 2d 178, 184, 11 O.O. 2d 174, 177, 327 N.E. 2d 654, 658; *Pickle* v. *Swinehart* (1960), 170 Ohio St. 441, 443, 11 O.O. 2d 199, 200, 166

N.E. 2d 227, 229. Alternatively, actual malice has been described as "extremely reckless behavior revealing a conscious disregard for a great and obvious harm." *Preston* v. *Murty* (1987), 32 Ohio St. 3d 334, 335, 512 N.E. 2d 1174, 1175. The presence of actual malice need not be expressed but "may be inferred from conduct and surrounding circumstances." *Columbus Finance, Inc., supra,* at 184, 71 O.O. 2d at 177, 327 N.E. 2d at 658.

It is therefore apparent that a determination of actual malice is derived from consideration of the facts adduced at trial. Thus, it was observed in *Hoskins*:

"Inasmuch as the breach of the duty to act in good faith is tortious in nature, punitive damages may be recovered against an insurer [that] breaches [its] duty of good faith in refusing to pay a claim of its insured *upon adequate proof.*" (Emphasis added.) *Id.* at 277, 6 OBR at 341, 452 N.E. 2d at 1320.

A review of the record in the case *sub judice* fails to disclose evidence from which the presence of actual malice on the part of Aetna may be derived.

At least a partial explanation for the award may be obtained by reference to the instructions given the jury. In considering these instructions, it is not altogether apparent that the jury evaluated the foregoing conduct in accordance with the legal standards applicable to a determination of actual malice. As mentioned previously, an award of compensatory damages against an insurance company for bad faith is predicated upon its refusal to pay the claim where such refusal is not founded upon circumstances that furnish reasonable justification therefor. In contrast, punitive damages may be recovered against an insurer that breaches its duty of good faith in refusing to pay a claim of its insured upon

proof of actual malice, fraud or insult on the part of the insurer. Thus, the evidence adduced in a particular case sufficient to establish bad faith on the part of the insurer may or may not be sufficient for the jury to further conclude that actual malice was exhibited by the insurer. However, in order for the jury to determine whether the bad faith of the insurer was accompanied by malice, it must be instructed regarding the elements necessary to establish both bad faith and malice. While the management of this complex litigation by the trial court below was commendable, it appears that there was juror confusion regarding the distinct standards applicable to bad faith and malice, respectively. In explaining the standard of conduct evidencing bad faith on the part of appellant, the trial court in its jury instruction remarked: "[Bad faith] imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or *ill will partaking of the nature of fraud.* It also embraces actual intent to mislead or deceive another." (Emphasis added.)

This standard, however, is more akin to that necessary to prove malice than bad faith. Conversely, the jury, at a different point in the instructions, was left with the impression that a finding of bad faith was sufficient for an award of punitive damages. Thus, the trial court observed:

"Gertrude Armstrong's claim under this cause of action, bad faith, is the foundation of her claim for compensatory *as well as punitive damages.*" (Emphasis added.)

While in a strictly technical sense this is a correct statement of the law (*i.e.,* absent a finding of tortious behavior punitive damages are not awardable), the jury could have easily drawn the conclusion that a finding of bad faith justified an award of punitive damages. This impression is underscored by a review of the verdict form which made no distinction between the requisite evidentiary standards to be employed in determining compensatory and punitive damages.[1]

Consequently, while the award of compensatory damages for breach of contract and the award of compensatory damages for bad faith are affirmed in their entirety, we reverse the award of punitive damages which is hereby vacated. The cause is remanded to the common pleas court for proceedings not inconsistent with this opinion.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

LOCHER, DOUGLAS and H. BROWN, JJ., concur.

MOYER, C.J., and WRIGHT, J., concur in part and dissent in part.

HOLMES, J., dissents.

MOYER, C.J., concurring in part and dissenting in part. I concur in the syllabus as an accurate statement of law. I also concur in the majority opinion to the extent that it affirms the award of compensatory damages for breach of contract and to the extent

---

[1] The form provided in relevant part:

"We the Jury, being duly impaneled, sworn and affirmed, find the issues in this case on the second cause of action (bad faith) in favor of the defendant Gertrude Armstrong and against the defendant Aetna Life Insurance Company. We find

that the defendant Aetna breached its duty to act in good faith as to the claim of its insured Gertrude Armstrong.

"We assess the damages as follows:

"Compensatory Damages $ 50,000.00
"Punitive Damages       $125,000.00"

that it reverses the award of punitive damages. I respectfully dissent from the majority opinion to the extent that it affirms the award of compensatory damages for breach of the duty to act in good faith. After a careful review of the facts and thorough briefing by counsel, the trial judge found the jury's finding with respect to coverage to be in conflict with its verdict. The Ohio Rules of Civil Procedure and the case law vest considerable discretion with the trial judge to grant a new trial in this context. We should not substitute our judgment for that of the trial court. I find no abuse of the trial court's discretion in granting a new trial pursuant to Civ. R. 49(B).

WRIGHT, J., concurs in the foregoing opinion.

HOLMES, J., dissenting. I would reverse the court of appeals in all respects. When faced with a general verdict and interrogatory answer which were irreconcilable, the trial court below acted properly and within its sound discretion in *sua sponte* ordering a new trial. Moreover, the evidence presented at trial does not support a recovery for breach of contract. I must therefore dissent.

As a threshold matter, the court of appeals erroneously, in my opinion, held that appellants had waived any objection that could be made to the verdict by failing to object prior to the court's discharge of the jury. This case is factually distinguishable from the typical waiver case. The court discharged the jury after affording the parties an opportunity to challenge the jury's verdict. Then, on its own motion, the court proceeded to consider the consistency of the general verdict and the interrogatory as answered by the jury. The court requested assistance in making this determination, asking each party to brief the issue. Ultimately, the court found the answer to the interrogatory inconsistent with the general verdict and, being unable to reconcile the two, ordered a new trial. Such action was wholly consistent with the discretion granted the court by Civ. R. 49(B). Where the verdict and answer are found to be consistent, the third paragraph of Civ. R. 49(B) mandates that the court *shall* enter the appropriate judgment pursuant to Civ. R. 58.[2] Where, as here, the verdict and answer are inconsistent, the rule grants the court discretion to proceed in one of three alternate ways: (1) enter judgment in accordance with the answers, pursuant to Civ. R. 58, (2) return the jury for further consideration of its verdict and answers, or (3) order a new trial. *This discretion is not conditioned upon the filing of an objection or other motion by either party.* Rather, the rule speaks solely to the court, guiding the court in the exercise of its inherent authority over entry of judgment. "While the verdict of the jury contributes to the jurisdiction and power of the court to enter the judgment, the act of sovereignty, the authoritative establishment of rights, is performed by the court." *Indus. Comm.* v. *Rogers* (1930), 122 Ohio St. 134, 137, 171 N.E. 35, 36, overruled on other grounds, *Indus. Comm.* v. *Klaff* (1931), 123 Ohio St. 451, 175 N.E. 697. This is in contrast to the first paragraph of Civ. R. 49(B) which specifically conditions the submittal of interrogatories to the jury on the request of a party and on submittal

---

[2] Civ. R. 58 provides, in part:

"Subject to the provisions of Rule 54(B), upon a general verdict of a jury, or upon a decision announced, the court shall promptly cause the judgment to be prepared and, the court having signed it, the clerk shall thereupon enter it. * * *"

to the court of such party's proposed interrogatories. See, also, *e.g.,* Civ. R. 3(C)(1) (change of venue conditioned on timely assertion of defense of improper venue); Civ. R. 19(A) (joinder of a party upon timely assertion of the defense of failure to join a party); Civ. R. 25 (substitution of parties conditioned upon motion therefor); Civ. R. 60(B) (relief from judgment for other than clerical mistakes conditioned on motion).

This is not a waiver case. Neither party initiated the court's consideration of the consistency issue; the court acted *sua sponte.* Civ. R. 59(D) provides:

"Not later than fourteen days after entry of judgment the court of its own initiative may order a new trial for any reason for which it might have granted a new trial on motion of a party. * * *"

This rule sets forth the inherent power of the court to control the granting of a new trial. Staff Note to subsection (D). Appellant, through its inaction, could not "waive" or divest the court of such power. The question of the consistency of the verdict with the answer to interrogatory one here was properly before the court of appeals.

The trial court below did not err in finding an inconsistency. Appellee Armstrong sought coverage under Article II of the group insurance contract between appellant Aetna and the Ohio Retirement Systems. The contract provided, however, that "[n]o insurance is afforded under any Title of Article II as to charges * * * (6) for custodial care * * *." Thus, a determinative issue in the case was whether the charges submitted by Staff Builders to Aetna were, in fact, for custodial care. The term "custodial care" was defined in the contract as set forth by the majority, *supra.* This definition was submitted verbatim to the jury, with a single inapplicable phrase omitted. The jury was asked, considering only the contractual definition, whether the services rendered were primarily for custodial care, to which it answered, "Yes."[3]

The majority surmises that the contract did not exclude what it calls "blended services," and that the interrogatory submitted to the jury encompassed only such "blended services." This argument fails from its inception, as the contractual definition does contemplate "blended" services, *i.e.,* partially professional and partially for assisting in daily living. The contract states that such services are excluded as "custodial care" where they are *primarily* for assisting in daily living. Where professional care predominates the exclusion does not apply, as the care is necessarily not "primarily to assist * * * [the patient] in the activities of daily living," and thus is not "custodial care." The addition of the word "primarily" in the question to the jury was mere surplusage, neither adding to nor subtracting from the contractual definition, and emphasizing, at most, that custodial care could encompass some professional-type services. The jury's affirmative answer thereto determined that the care provided to Armstrong was excluded, and was thus inconsistent with its general verdict in Armstrong's favor. I would thus reinstate the trial court's order for a new trial on all issues presented herein.

---

[3] The record reveals that the trial court inserted the word "primarily" in the question, over the objection of Aetna, pursuant to Civ. R. 49(B). Furthermore, the jury questioned the court on the purpose for this insertion, and was instructed to consult the insurance policy.