LeFORGE et al., Appellees,

v.

**NATIONWIDE MUTUAL FIRE INSURANCE COMPANY, Appellant.**

[Cite as *LeForge v. Nationwide Mut. Fire Ins. Co.* (1992), 82 Ohio App.3d 692.]

Court of Appeals of Ohio,
Clinton County.

No. CA91–12–025.

Decided Oct. 5, 1992.

694

*Bryant Law Offices* and *Timothy S. Chappars; Reid & Buckwalter* and *Michael A. Buckwalter,* for appellees.

*Droder & Miller Co., L.P.A.,* and *Dennis W. Van Houten,* for appellant.

*Per Curiam.* ·

Defendant–appellant, Nationwide Mutual Fire Insurance Company ("Nationwide"), appeals a judgment of the Clinton County Court of Common Pleas in favor of plaintiffs-appellees, Daniel and Cheryl LeForge.

In the early morning hours of March 16, 1989, the LeForges' home, a double-wide mobile home placed on a permanent foundation, was destroyed by fire. At the time of the fire, the LeForges' home was insured by Nationwide. The LeForges submitted a claim which was formally rejected by Nationwide on September 6, 1989 on the basis that the LeForges had intentionally caused the fire. Consequently, on February 28, 1990, Daniel LeForge filed a complaint against Nationwide, alleging breach of contract and breach of an insurer's duty to act in good faith. The complaint was later amended to add Cheryl LeForge as a plaintiff.

A jury trial commenced on October 7, 1991. The evidence revealed that on the night of the fire, the LeForges and their two children were out of the home, spending the night in a small storage area above the family business located in Wilmington, a few miles away. The business, known as BRS Communications, was a telephone operating service which required someone to be present to answer the telephones twenty-four hours a day. The LeForges frequently spent the night at the business for this purpose. It was a new business and they did not yet have the ability to hire an employee to answer the telephone at night.

The fire was discovered by Samuel LeForge, Daniel LeForge's father, who drove past the home on his way to work. Sandra and Dennis Wilson, the neighbors, testified that they heard a car door slam shortly before the fire but they did not see any cars. A short time later they saw an orange glow coming from the LeForges' house. They testified that Samuel LeForge appeared to be very upset and he tried to determine if the family was in the home.

Pete Patterson, a claims adjuster for Nationwide, arrived the following morning. Immediately upon arriving, he concluded that the fire was "suspi-

cious." He met with the LeForges, had them fill out several forms and advanced them approximately $3,000 for living expenses.

Local fire officials and an investigator from a consulting firm hired by Nationwide concluded that the fire started in the basement near a wood-burning stove. A door on the wood-burning stove was left open. Daniel LeForge testified that he put wood in the stove earlier in the day, but could not remember if he had closed the doors. The investigators found irregular burn patterns and "spalling" on the concrete, indicating areas of extreme heat. They concluded, based solely on this evidence, that a flammable liquid was used and the fire was intentionally set. However, neither field tests nor laboratory tests of several carpet samples revealed the presence of an accelerant. Further, the LeForges' expert testified that irregular burn patterns have other causes besides flammable liquids and, because of the amount of damage caused by the fire, it would be virtually impossible to determine its cause. No criminal investigation was ever instituted and none of Nationwide's experts could say who started the fire.

Shortly after the fire, Patterson discovered that Daniel LeForge owed a substantial amount of money to the Internal Revenue Service ("IRS"). Daniel LeForge testified that he personally incurred the tax liability because he was an officer in another corporation in which an employee had embezzled funds and failed to pay payroll taxes. Although there was a tax lien on the residence, Daniel LeForge had made an agreement with the IRS in which his wages were garnished to pay the debt. The IRS was not making any other collection efforts and was not attempting to foreclose on the property. The LeForges were not in dire financial condition and were meeting their monthly financial obligations.

Patterson admitted that the LeForges had cooperated completely with the insurance company's investigation. They timely submitted a proof of loss form, allowed their premises to be searched, and appeared at Nationwide's counsel's office to provide statements under oath. Patterson also admitted that he and his manager, who did not testify at trial, made the decision to deny the claim.

Patterson pointed to various "red flags" which indicated that arson had been committed. For example, Daniel LeForge had some suits at the dry cleaners at the time of the fire. When asked to provide evidence of the contents of the basement, the LeForges were able to obtain a videotape of their son's birthday party which had been given to a relative. Patterson claimed the videotape was an artificial attempt to document damage. Patterson also pointed to the fact that the home was insured for $75,000, while he determined that the replacement cost for the mobile home and the foundation

was approximately $52,000. However, the evidence showed that a Nationwide agent personally examined the premises and wrote the policy for $75,000 and that the LeForges paid a higher premium as a result.

The LeForges testified that Nationwide paid them approximately $7,500 in living expenses, then stopped paying altogether. They were forced to stop making payments on their boat and their van and both were later repossessed. They lost almost all of their personal belongings, including family mementos. The mortgage on their home cost approximately $263 per month, which they continued to pay for several months until Nationwide paid it off. Because they could not find suitable housing for an amount comparable to what they had been paying on the mortgage, they were forced to live upstairs at the commercial building which housed their family business, which did not have a suitable kitchen or bathroom and was inadequate for a family of four. Both Cheryl and Daniel LeForge were forced to take extra jobs, and they began having marital problems as a result of the stress caused by financial problems and lack of time.

After hearing the evidence, the jury returned a verdict in favor of the LeForges on their breach of contract claim for $85,000 and on the bad faith claim for $60,000. However, the jury also concluded that the LeForges did not prove by clear and convincing evidence that Nationwide acted with actual malice and therefore did not award punitive damages.

After trial, Nationwide filed motions for judgment notwithstanding the verdict and for a new trial which were overruled by the trial court. The LeForges filed a motion for prejudgment interest which the trial court granted in part and denied in part, awarding prejudgment interest on the breach of contract claim only. This appeal followed.

Nationwide presents seven assignments of error for review. In its first assignment of error, Nationwide states that the trial court erred in giving the LeForges' requested bad faith instruction. It argues that the trial court's failure to instruct the jury that "mere refusal to pay an insurance claim is not, in itself, conclusive of an insurer's bad faith" was prejudicial. We find this assignment of error is not well taken.

An insurer has a duty to act in good faith in the processing and payment of the claims of its insured. A breach of this duty will give rise to a cause of action in tort against the insurer irrespective of any liability arising from breach of contract. *Staff Builders, Inc. v. Armstrong* (1988), 37 Ohio St.3d 298, 525 N.E.2d 783, paragraph one of the syllabus; *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272, 6 OBR 337, 452 N.E.2d 1315, paragraph one of the syllabus.

In *Hoskins, supra,* the Ohio Supreme Court discussed the term "lack of good faith," stating:

" 'A lack of good faith is the equivalent of bad faith, and bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.'

" * * * [I]t is clear that whenever an insurance company denies a claim of its insured, it will not automatically expose itself to an action in tort. Mere refusal to pay insurance is not, in itself, conclusive of bad faith. But when an insured [*sic*] insists that it was justified in refusing to pay a claim of its insured because it believed there was no coverage of the claim, ' * * * such a belief may not be an arbitrary or capricious one. The conduct of the insurer must be based on circumstances that furnish reasonable justification therefor.' " *Id.* at 276–277, 6 OBR at 341, 452 N.E.2d at 1320, quoting *Slater v. Motorists Mut. Ins. Co.* (1962), 174 Ohio St. 148, 21 O.O.2d 420, 187 N.E.2d 45, paragraph two of the syllabus, and *Hart v. Republic Mut. Ins. Co.* (1949), 152 Ohio St. 185, 188, 39 O.O. 465, 466, 87 N.E.2d 347, 349.

Additionally, in the recent case of *Motorists Mut. Ins. Co. v. Said* (1992), 63 Ohio St.3d 690, 590 N.E.2d 1228, the Ohio Supreme Court stated at paragraphs three and four of the syllabus:

"A cause of action arises for the tort of bad faith when an insurer breaches its duty of good faith by intentionally refusing to satisfy an insured's claim where there is either (1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) an intentional failure to determine whether there was any lawful basis for such refusal. Intent that caused the failure may be inferred and imputed to the insurer when there is a reckless indifference to facts or proof reasonably available to it in considering the claim.

" 'No lawful basis' for the intentional refusal to satisfy a claim means that the insurer lacks a reasonable basis in law or fact for refusing to satisfy the claim. Where a claim is fairly debatable the insurer is entitled to refuse the claim as long as such refusal is premised on a genuine dispute over either the status of the law at the time of the denial or the facts giving rise to the claim."

The trial court instructed the jury as follows:

"Second claim for relief brought by Plaintiffs alleges the tort of bad faith handling of their insurance claim. In every insurance contract there is an implied obligation of an insurer to adjust, to process and to handle the claims

of it's [sic] insured in good faith and in a fair manner. This obligation includes the duty of the insured [sic] to act in good faith in discharging it's [sic] contractual responsibilities to its insured. The conduct of the insurer must be based upon circumstances that furnish reasonable justification therefor.

"Accordingly, an insurer fails to exercise good faith in the processing and handling of the claim of its insured, if it, without reasonable justification, relies upon the defense of arson if it cannot be proven.

"If you find that the Defendant, Nationwide Mutual Fire Insurance Company did not have reasonable justification for it's [sic] actions and conduct in this case, in discharging it's [sic] contractual obligations to the Plaintiffs, then you will find for the Plaintiffs on the issue of bad faith and award damages which were proximately caused thereby."

■ A charge to the jury should be a plain, distinct and unambiguous statement of the law as applicable to the case made before the jury by the proof adduced. An error in an instruction is not grounds for reversal unless the charge as given misleads the jury to the prejudice of the party seeking the reversal. *Marshall v. Gibson* (1985), 19 Ohio St.3d 10, 12, 19 OBR 8, 10, 482 N.E.2d 583, 585; *Dubecky v. Horvitz Co.* (1990), 64 Ohio App.3d 726, 740, 582 N.E.2d 1087, 1096.

While it might have been better for the trial court to explicitly state that the refusal to pay an insurance claim is not in and of itself conclusive of an insurer's bad faith, that concept is implicit in the instruction given which generally comports with the law as set forth in *Staff Builders, Hoskins* and *Said*. The trial court made it clear that the LeForges were required to prove more than just that Nationwide denied the claim. Further, the LeForges never claimed that the simple denial of the claim itself demonstrated bad faith. They argued that Nationwide's persistence in clinging to the belief that the LeForges set the fire despite meager evidence that the fire was intentionally set and absolutely no evidence that the LeForges were the culprits constituted bad faith. We cannot conclude upon looking at the trial court's instruction, the record as a whole, and the jury's verdict that the jury was misled by any error in the trial court's instructions. Accordingly, Nationwide's first assignment of error is overruled.

■ In its second assignment of error, Nationwide states that the trial court erred in failing to grant a directed verdict in favor of Nationwide. It argues that the LeForges did not present any evidence showing bad faith or resulting damages from the alleged bad faith. We find this assignment of error is not well taken.

In ruling on a motion for a directed verdict pursuant to Civ.R. 50(A), the court must construe the evidence presented at trial most strongly in favor of the party against whom the motion is made. Where there is substantial evidence to support that party's side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon a motion for a directed verdict. *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 28 OBR 410, 411, 504 N.E.2d 19, 21.

We find that the evidence in this case was sufficient to permit reasonable minds to reach different conclusions on the issue of whether Nationwide denied the LeForges' claim without reasonable justification or lawful basis. See *Hoskins* and *Said, supra*. The LeForges' evidence, if believed, showed that Patterson arbitrarily and capriciously clung to the belief that the LeForges committed or conspired to commit arson despite a lack of any real evidence. Patterson relied on reports of so called "independent" investigators who were in fact closely aligned with the insurance industry; he made the decision to deny the claim himself, and he construed even the most innocuous things, such as the fact that Daniel LeForge had some suits at the dry cleaners, as "red flags" indicating that the LeForges burned their own house. The issue was clearly one for the jury, and the trial court did not err in overruling Nationwide's motion for a directed verdict.

Nationwide also argues that the LeForges failed to present any evidence of extracontractual damages that they suffered as a result of Nationwide's refusal to pay the claim. It argues that the trial court incorrectly instructed the jury that it could award "reasonable compensation for the mental anguish and inconvenience caused by the lack of insurance benefits" and that the LeForges' self-serving testimony about stress and inconvenience without corroboration through expert testimony was insufficient to prove damages.

A bad faith claim, if proven, allows for recovery of extracontractual damages. These are damages over and above those covered by the insurance contract sustained by the insured as a consequence of the insurer's bad faith. *Asmaro v. Jefferson Ins. Co. of New York* (1989), 62 Ohio App.3d 110, 118, 574 N.E.2d 1118, 1123.

In *Eastham v. Nationwide Mut. Ins. Co.* (1990), 66 Ohio App.3d 843, 586 N.E.2d 1131, the First District Court of Appeals rejected the same argument Nationwide now makes. The court began its analysis by stating the principle that expert medical testimony is not required in every case to determine the extent of a person's injuries and pain and suffering. When it is

a matter of common knowledge that a certain act may produce injury, expert testimony is not required. The court went on to conclude that testimony by the insured's wife that the insured became nervous and had to take medication when bill collectors appeared was sufficient to establish the physical damages sustained by the insured as a result of the insurer's failure to adjust the claim in a timely fashion. "An expert witness was not required to prove that [the insured] was nervous when confronted by bill collectors since it is a matter of common knowledge that continued harassment regarding unpaid medical bills may make an individual nervous and may aggravate a pre-existing heart condition." *Id.* at 848, 586 N.E.2d at 1134.

Similarly, in the present case it was within the common knowledge of the jury that the LeForges would suffer mental anguish as a result of losing all of their possessions, suffering financial problems, living in unsuitable housing, having their van and boat repossessed, and working multiple jobs. The LeForges offered the same type of proof on mental anguish and inconvenience as would a personal injury plaintiff seeking compensation for pain and suffering. Nationwide relies on *Asmaro, supra,* and other cases where courts held that the insured failed to present sufficient evidence of damage by failing to prove lost profits, attorney fees, and the like. However, these issues would not be within the common knowledge of the jury and would need to be corroborated by independent evidence. Accordingly, Nationwide's second assignment of error is overruled.

 In its third assignment of error, Nationwide states that the trial court erred in allowing the testimony of the LeForges' expert witness. It argues that the expert's testimony talked in terms of possibilities and was therefore not probative as to the cause and origin of the fire. We find this assignment of error is not well taken.

 The admission or exclusion of relevant evidence rests within the discretion of the trial court. The decision to admit or exclude evidence will not be reversed on appeal absent an abuse of discretion. *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163, 17 O.O.3d 98, 100, 407 N.E.2d 490, 493. Expert testimony is admissible if it will assist the trier of fact to understand the evidence or to determine an issue of fact. Evid.R. 702; *Lee v. Baldwin* (1987), 35 Ohio App.3d 47, 49, 519 N.E.2d 662, 664.

Nationwide argues that the LeForges' expert witness offered no opinions as to the probable cause of the fire and that his testimony was couched in "possibilities," not "probabilities." Because an expert may not express an opinion on direct examination as to a "possible" relationship, his testimony was inadmissible. See *Shumaker v. Oliver B. Cannon & Sons, Inc.* (1986),

28 Ohio St.3d 367, 369, 28 OBR 429, 430, 504 N.E.2d 44, 46; *Drew v. Indus. Comm.* (1940), 136 Ohio St. 499, 501, 17 O.O. 113, 114, 26 N.E.2d 793, 794.

This argument misconstrues the expert's testimony. He testified based upon his qualifications and experience to a reasonable degree of scientific certainty that, in his opinion, irregular burn patterns have other causes besides flammable liquids and that the damage in the residence was so extensive that it was impossible to tell the exact cause of the fire. His testimony was specifically used to rebut Nationwide's experts' testimony that the irregular burn patterns were caused by a flammable liquid. Despite Nationwide's claim to the contrary, this testimony would clearly assist the jury in determining whether Nationwide was justified in concluding that the fire was intentionally set. See *Jaric, Inc. v. Chakroff* (1989), 63 Ohio App.3d 506, 518–519, 579 N.E.2d 493, 500–502. We cannot conclude that the trial court's decision to admit the expert's testimony was so unreasonable, arbitrary or unconscionable as to connote an abuse of discretion. See *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 218, 5 OBR 481, 481, 450 N.E.2d 1140, 1141. Accordingly, Nationwide's third assignment of error is overruled.

In its fourth assignment of error, Nationwide states that the trial court erred in admitting into evidence Nationwide's annual reports together with related testimony. It argues that the annual reports showing Nationwide's assets could have influenced the jury to award bad faith damages. We find this assignment of error is not well taken.

Evidence of a defendant's wealth is relevant when considering an award of punitive damages. Therefore, Nationwide's financial statements were admissible since the LeForges were seeking punitive damages. *Spadafore v. Blue Shield* (1985), 21 Ohio App.3d 201, 205, 21 OBR 215, 218, 486 N.E.2d 1201, 1205. Nationwide argues that, because the jury did not find actual malice and did not award punitive damages, the annual reports influenced the jury to award bad faith damages. We disagree. To the contrary, the jury must not have been influenced by Nationwide's "deep pockets" because, while finding bad faith, it did not award punitive damages. We find no evidence that the jury's verdict is the result of prejudice, and we cannot conclude that the trial court abused its discretion in admitting the financial reports into evidence. Accordingly, Nationwide's fourth assignment of error is overruled.

In its fifth assignment of error, Nationwide states that the trial court erred in failing to give its proposed jury instruction defining the burden of proof in a criminal case to distinguish it from the burden of proof in a civil case. Nationwide argues that the instruction could have cured possible confusion on the part of the jury since the LeForges repeatedly emphasized

that there was no criminal investigation or conviction for arson. We find this assignment of error is not well taken.

The trial court did not err in refusing to give Nationwide's proposed special instruction since an instruction on the burden of proof in a criminal case was simply not pertinent to the issues presented at trial. See *Walczesky v. Horvitz Co.* (1971), 26 Ohio St.2d 146, 150–151, 55 O.O.2d 277, 279, 269 N.E.2d 844, 846–847. Further, the instruction clearly had the potential to mislead the jury. *Marshall v. Gibson* (1985), 19 Ohio St.3d 10, 12, 19 OBR 8, 10, 482 N.E.2d 583, 585. The trial court gave a standard jury instruction as to proof by a preponderance of the evidence. Further, in regard to the issue of punitive damages, the trial court properly instructed the jury that they had to find actual malice by clear and convincing evidence. The court then gave a standard instruction as to proof by clear and convincing evidence. Another instruction as to a third burden of proof which was not even relevant to the issues presented at trial was more likely to confuse the jury than to clarify any issue. Accordingly, we conclude that the trial court did not err in failing to give Nationwide's proposed instruction and its fifth assignment of error is overruled.

In its sixth assignment of error, Nationwide states that the trial court erred by excluding evidence regarding a previous fire at the same location involving other members of the LeForge family. Nationwide argues that it relied on this evidence in denying the claim and that the evidence was probative on the issue of whether it acted in bad faith. We find this assignment of error is not well taken.

Nationwide sought to introduce testimony that Patterson became aware that there had been a fire at the same location some ten years earlier when the property was owned by other members of the LeForge family. It claims this evidence showed another "red flag" upon which Patterson relied in denying the claim. The trial court concluded that claims made by other family members were not relevant to the issues before the court. We agree.

Relevant evidence means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Evidence is relevant when it tends as a matter of common experience and logic to prove a matter of consequence. Staff Note to Evid.R. 401. We cannot conclude that the trial court abused its discretion by excluding evidence of a completely unrelated fire loss that did not involve the LeForges themselves, since the LeForges were probably living out of the state at the time. The fact that other family members made a claim for a fire loss does not tend to prove any fact that is of consequence in determining

whether Nationwide acted in bad faith or breached the insurance contract. Further, even if this evidence were relevant, the trial court would have been within its discretion to conclude that its probative value was substantially outweighed by the danger of unfair prejudice. Evid.R. 403(A). Accordingly, Nationwide's sixth assignment of error is overruled.

In its seventh assignment of error, Nationwide states that the trial court erred in granting prejudgment interest to the LeForges on the breach of contract claim. It argues that it had a good faith belief that it had no liability or duty of coverage due to the arson policy exclusion and therefore had no obligation to make a monetary settlement offer. We find this assignment of error is not well taken.

R.C. 1343.03(C) provides:

"Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid, if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."

The decision of whether prejudgment interest is warranted lies within the discretion of the trial court on a case-by-case basis. *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 159, 25 OBR 201, 202, 495 N.E.2d 572, 574; *Mills v. Dayton* (1985), 21 Ohio App.3d 208, 210, 21 OBR 222, 224, 486 N.E.2d 1209, 1211. In *Kalain*, the Ohio Supreme Court construed the meaning of the phrase "failed to make a good faith effort" as used in R.C. 1343.03(C) as follows:

"A party has not 'failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer." *Id.* at syllabus.

Prejudgment interest may be assessed in favor of the insured under an insurance policy where the insurer does not make a reasonable offer of settlement on or before the date the loss is due and payable. *Clevenger v. Westfield Cos.* (1978), 60 Ohio App.2d 1, 3–4, 14 O.O.3d 3, 4–5, 395 N.E.2d 377, 379–380. In the present case, the jury concluded that Nationwide's failure to

pay its obligations under the contract was without reasonable justification. Given the evidence presented, the conclusion that Nationwide failed to rationally evaluate its risk and potential liability was certainly within the discretion of the trial court. We cannot conclude that its decision to award prejudgment interest on the breach of contract claim was so unreasonable, arbitrary or unconscionable as to connote an abuse of discretion. Accordingly, Nationwide's seventh assignment of error is overruled.

The assignments of error properly before this court having been ruled upon as heretofore set forth, it is the order of this court that the judgment or final order herein appealed from be, and the same hereby is, affirmed.

*Judgment affirmed.*

KOEHLER, P.J., WILLIAM W. YOUNG and WALSH, JJ., concur.