**PIZZINO, Appellant,**

v.

**LIGHTNING ROD MUTUAL INSURANCE COMPANY, Appellee.**

[Cite as *Pizzino v. Lightning Rod Mut. Ins. Co.* (1994), 93 Ohio App.3d 246.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 65674.

Decided Feb. 22, 1994.

Dennis Seaman & Associates and David A. Kulwicki, for appellant.

Dyson, Schmidlin & Foulds Co., L.P.A., and Robert J. Foulds, for appellee.

---

Per Curiam.

Plaintiff-appellant Cindy Pizzino appeals the trial court's order granting the motion for summary judgment filed by the defendant-appellant Lightning Rod Mutual Insurance Company ("Lightning Rod"). The appellant seeks to set aside a release entered into with her insurer, Lightning Rod, as a result of an accident with an uninsured motorist. Subsequent to the execution of the release, the appellant learned that she had suffered a herniated disk in her back.

At her deposition, the appellant stated that on October 6, 1991, at 10:00 or 11:00 p.m., she was proceeding east on Trowbridge Avenue when she was struck by a van proceeding west, towards her. There was a vehicle parked on the opposite side of the street. The van hit her head-on as it tried to maneuver around the parked vehicle. The police arrived at the scene, but did not issue any citations.

After the accident she did not realize she had been injured, and went home to bed. She did not sleep well, and sought medical attention the next day at a medical center in Parma. The following week, she was seen at Metro Hospital, where she received X-rays and medication. She was then treated for two months at the Cleveland Clinic, where she was X-rayed again, given medication and physical therapy.

Within two days after the accident, the adjuster, John Applegate, visited her home. During the course of resolving her claim, she met with the adjuster three times, and spoke with him on the telephone on several occasions.

The appellant spoke to Applegate in late November 1991, and asked if she was eligible for compensation for lost wages. She was told that uninsured motorist

coverage did not cover lost wages. She requested compensation for transportation while her vehicle was being repaired, and was told that there was no coverage.

Appellant stated at her deposition that Applegate talked her out of seeing more doctors, and told her that the MRI recommended by the Cleveland Clinic would probably not be covered because of the policy limits. Applegate told her that because no one was cited by the police, no one was at fault. He informed her that in order for her to recover under uninsured motorist coverage, she would have to show that the other driver was at fault. He indicated that her claim was questionable.

Pizzino further stated that she requested a copy of her policy because she was confused as to her coverage. Her health insurance through her employment covered a portion of the medical costs, and she wanted to know why the balance was not covered under her motor vehicle insurance. She did not understand the policy, and had questions as to why her lost wages were not compensable. After receiving the policy, she telephoned Applegate for a further explanation. Applegate used the term "no fault" in the context of discussing with her that she would have to show the other driver was at fault in order to recover under her uninsured motorist provision. She also asked Applegate what the medical payments provisions of the policy should cover, and what should be covered under the uninsured motorist provisions.

Appellant had questions as to how she should pay for all of the medical bills she was receiving in the mail; she wanted to know what would be covered because the doctors were telling her to get more coverage; Applegate was concerned that she was being "taken" by the doctors, and told her she did not have that much coverage. Applegate gave her the documents to fill out for an uninsured motorist claim for lost wages, but he indicated to her that she needed to be able to prove the other driver was at fault in order to be covered and that she did not have the requisite proof. He told her it was unlikely that she would be covered. She never finished processing the paperwork. She had lost her job before her claim was settled.

In February 1992, appellant met with Applegate and received a check for $1,377.96. This check was reimbursement for some of her transportation costs; $937.73 for medical expenses that were unpaid by her health insurance; and supplemental property damage in the amount of $111.27. These three items totaled $1,049. The extra monies were for a medical bill in the amount of $180 from the Cleveland Clinic which was due, but not paid. Appellant did not understand that the extra money was paid under the uninsured motorist provision of her policy.

Appellant read and signed the release. She understood the release to be final, and realized that she was extinguishing the uninsured motorist claim. At the time she signed the release, she did not realize she had damage to her spinal column as a result of the accident, nor did anyone connected with her insurance company, Lightning Rod.

At his deposition, John Applegate stated that he is obligated, as part of his employment, to explain coverage issues to claimants. Although he had received medical reports from appellant's doctors at the time the release was signed, he was unaware that the appellant had a herniated disk.

The check issued to the appellant for $1,377.96 was compensation under both medical payment and uninsured motorist sections of the policy. He denied any knowledge of a subsequent Cleveland Clinic bill for $180 being added into the settlement. The settlement check reflected $328.96 more than the medical bills ($890.60), the prescriptions ($47.15), and the additional property damage ($111.30). This additional amount was to settle the uninsured motorist claim. Applegate testified that this amount was to compensate for out-of-pocket expenses and lost wages. He knew at the time of settlement that this amount would not cover all of the accrued lost wages. He had no idea that there would be additional future medical bills. He believed that if there were future medical bills, appellant would be able to reopen the claim and be covered under her medical payments portion of the policy.

Applegate stated that this case presents a clear question of liability. He communicated to the appellant that he believed her claim was doubtful because of the liability question. He spoke with both Pizzino and her passenger; they indicated the accident was the fault of the other driver. He spoke with the other driver, and his passenger, who both indicated the accident was the fault of Pizzino. The police report cited no one. In viewing the scene of the accident, Applegate noted a wide street. He stated that there was room for two vehicles to pass and not hit a parked car. He also stated that there was no center line in the street, and no skid marks from either vehicle. Both parties claimed the other was on the wrong side of the road.

When he discussed the uninsured motorist provision of the policy with the appellant, he believed that she understood, and was satisfied with his explanation. Although he tried to explain, the appellant did not understand the wage loss portion of the policy.

Applegate identified deposition Exhibits 2 and 3, both of which were correspondence from him and addressed to the appellant. Exhibit 2 was a handwritten memo stating in part: "The auto policy does not cover loss of work or travel expenses. The policy you have is basically a LIABILITY policy and it protects YOU from claims against YOU by others." Exhibit 3 is a typed letter stating:

"Again, to review our discussion, I did advise that there was no evidence that an uninsured motorist claim would be possible. As you know, the other driver and the passenger of the other vehicle relate that they were not negligent in the operation of their motor vehicle. We have no independent witnesses. Accordingly, under the terms and conditions of your personal auto policy there would be no coverage for the inconvenience, mileage, and wage loss."

The appellant sets forth three assignments of error:

"I

"The trial court erred in granting summary judgment in favor of defendant-appellee as to plaintiff-appellant's fraud claim when a genuine issue of material fact exists.

"II

"The trial court erred in granting summary judgment in favor o [sic] defendant-appellee as to plaintiff-appellant's insurance bad faith claim when a genuine issue of material fact exists.

"III

"The trial court erred in granting summary judgment in favor of defendant-appellee as to plaintiff-appellant's breach of contract claim when a genuine issue of material fact exists."

The appellant argues that, first, the release reflects a settlement which was entered into as a result of fraud; next, the appellant argues that she should be permitted to pursue her claim for bad faith; and, last, she argues that the contract of insurance was breached by the appellee when it refused to arbitrate the request to reopen the file. In this third argument, the appellant asserts that the release should be set aside, as it was executed by a mutual mistake as to the existence of an injury.

The standard for ruling on a motion for summary judgment is pronounced in Civ.R. 56(C) as follows:

"Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion

and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor."

In *AAAA Enterprises, Inc. v. River Place Community Urban Redev. Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597, 601, the court held:

"Summary judgment is a potentially useful, but extraordinary, procedure wherein the trial of issues of fact made up by the pleadings is avoided. Because summary judgment represents a shortcut through the normal litigation process by avoiding a trial, the burden is strictly upon the moving party to establish, through the evidentiary material permitted by the rule, that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Civ.R. 56(C)."

The trial court granted the motion of the defendant insurer as to all claims raised by the appellee. Depositions of both the appellant and of the adjuster were filed with the court.

The first issue raised by the appellant is that of fraud. In *Haller v. Borror Corp.* (1990), 50 Ohio St.3d 10, 552 N.E.2d 207, the Supreme Court held that a release from liability obtained by fraud in the factum is void *ab initio*, while one obtained by fraud in the inducement is merely voidable. The court defined "fraud in the factum" and determined that in order to obtain a release, the releasor must tender back the consideration paid by the releasee:

" * * * Rather, the releasor claims that he was induced to grant the release upon the wrongful conduct or misrepresentation of the person so benefited. The misrepresentation may concern the economic value of the claim released, *Pickle-simer, supra,* and wrongful conduct may include even coercion and duress. *National Bank v. Wheelock* (1895), 52 Ohio St. 534, 40 N.E. 636. So long as the releasor understands the nature and character of his act of release and that the releasee will no longer be liable on the claims concerned, or has an opportunity to do so, the fraud is in the inducement only and does not constitute a basis to find the agreement void. In that event it is voidable only, and in order to subject it to attack the releasor must first tender back the consideration paid. No tender is required for fraud in the factum, if alleged.

"The foregoing distinctions between fraud in the factum and fraud in the inducement, and the resulting voidability of a release procured, arise from two well-settled policies of the law. First, the law favors the prevention of litigation by the compromise and settlement of controversies. *White v. Brocaw* (1863), 14 Ohio St. 339, 346. Second, a releasor ought not to be allowed to retain the benefit of his act of compromise and at the same time attack its validity when he understood the nature and consequence of his act, regardless of the basic nature

of the inducement employed. *Shallenberger v. Motorists Mut. Ins. Co.* (1958), 167 Ohio St. 494, 5 O.O.2d 173, 150 N.E.2d 295. In that event, the consideration should first be returned so that the parties may be placed in the positions they enjoyed prior to the practice of the fraud alleged.

"Whether a release was procured through fraud of either type is a question for the trier of fact. Whether the fraud as alleged is in the factum or in the inducement is an issue of law for the court. *Dice v. Akron, Canton & Youngstown RR. Co., supra* [ (1951), 155 Ohio St. 185, 44 O.O. 162, 98 N.E.2d 301]." *Id.*, 50 Ohio St.3d at 14–15, 552 N.E.2d at 211.

Applying this law to the case before us, the appellant has set forth a claim for fraud in the inducement, and not for fraud in the factum. Appellant unequivocally stated in her deposition that she read the release before signing, and was aware that by executing the release future claims were extinguished.

The record on appeal does not affirmatively show that the appellant has tendered to the appellee the consideration received for executing the release. Although at least one court has been critical of the determination in *Haller* that the tender of the consideration is a prerequisite to voiding a release, we are bound by the Supreme Court's determination on this issue. See *Maust v. Bank One, Columbus, N.A.* (1992), 83 Ohio App.3d 103, 110, 614 N.E.2d 765, 769. The appellant's first assignment of error is overruled.

However, setting aside a release because of a mutual mistake as to the nature and extent of the releasor's injuries is permissible. This court discussed the substantive law for claims of mutual mistake in *Harchick v. Baio* (1989), 62 Ohio App.3d 176, 574 N.E.2d 1160:

"With respect to the substantive law regarding a claim of mutual mistake in executing a release, it is clear that a mutual mistake as to the full extent of the releasor's injuries is a defense to a release, if the parties did not intend to relinquish all future claims. *Sloan v. Standard Oil Co.* (1964), 177 Ohio St. 149, 29 O.O.2d 355, 203 N.E.2d 237, paragraph one of the syllabus; *Woyma v. Ciolek* (1983), 11 Ohio App.3d 288, 290, 11 OBR 518, 519, 465 N.E.2d 486, 488.

"Further, a factual dispute as to whether the parties intended that the release bar all future claims is a material issue which must be determined by the trier of fact. *Sloan v. Standard Oil Co., supra*, at paragraph two of the syllabus; *Prada v. Nationwide Mut. Ins. Co.* (Dec. 2, 1982), Cuyahoga App. No. 44809, unreported, 1982 WL 2568.

"Moreover, factors to be considered in determining the parties' intent at the time the release was executed include '[t]he absence of bargaining and negotiating leading to settlement; the release is clearly liable; absence of discussion concerning personal injuries; the contention that the injuries were in fact

unknown at the time the release was executed is reasonable; an inadequate amount of consideration received compared with the risk of the existence of unknown injuries (see *Casey v. Proctor, supra* [ (1963), 59 Cal.2d 97, 28 Cal.Rptr. 307, 378 P.2d 579], and authorities cited therein); haste by the releasee in securing the release (annotation, 71 A.L.R. [2d], 82, 169 [1960] ); and the terms of the release exclude the injuries alleged (annotation, 71 A.L.R. [2d], 82, 156 [1960] ).' *Sloan v. Standard Oil Co., supra,* 177 Ohio St. at 153, 29 O.O.2d at 358, 203 N.E.2d at 240." *Id.* 62 Ohio App.3d at 180–181, 574 N.E.2d at 1162–1163.

█ In the case *sub judice,* the appellant has met her burden of showing the existence of a material issue of fact. Applegate stated in his deposition that he believed that the appellant would be able to recover future medical expenses under the medical payments portion of her policy. In addition, both Pizzino and Applegate testified at their respective depositions that at the time of the release they did not know Pizzino had suffered a herniated disk.

Appellant has presented a clear question of the intent of the parties as to the finality of the release, and has shown that there existed a mutual mistake as to the nature and extent of the appellant's injuries at the time the release was executed. No compensation was provided for such an extensive injury in the settlement agreed to by the parties. Appellant's third assignment of error is well taken.

█ An insurer's duty of good faith towards its insured arises out of the contract, and is implied at law. The duty of good faith is breached only by an intentional failure by the insurer to perform under its contract with the insured. In *Motorists Mut. Ins. Co. v. Said* (1992), 63 Ohio St.3d 690, 590 N.E.2d 1228, the Supreme Court extensively discussed the parameters of the tort of bad faith.

The court reiterated that compensatory damages for an insurer's bad faith should not be awarded merely for the denial of a claim, and that such a denial is not conclusive of bad faith. Mere negligence is not enough. The court held:

"In order to demonstrate the tort of bad faith, some form of wrongful intent must be proven. A finding of bad faith involves an inquiry into the insurer's state of mind. It is not enough that the insurance company exercised poor judgment in withholding coverage; the insurer must, through its actions, or inactions, intentionally refuse to satisfy the insured's claim. Additionally, when the nature of the insurer's conduct is malicious, such as when it is done for a dishonest purpose, or actual intent to mislead or deceive the insured, or calculated to defeat the insured's claim, then the insurer may be subjected to punitive damages.

"As shown above, the duty of an insurance company to its insured is analogous to that of a fiduciary. Accordingly, it is the duty of an insurance company to

assess claims after an appropriate and careful investigation, and its conclusions should be the result of the weighing of probabilities in a fair and honest way. For an insurance company's decision on a claim to be made in good faith, it must be based upon knowledge of the facts and circumstances upon which liability is predicated. The absence of any diligence concerning a claim and the insurer's refusal to determine the nature and extent of the liability may, in certain instances, evidence bad faith. See *Anderson v. Continental Ins. Co.* (1978), 85 Wis.2d 675, 688, 271 N.W.2d 368, 375.

"Accordingly, we hold that a cause of action arises for the tort of bad faith when an insurer breaches its duty of good faith by intentionally refusing to satisfy an insured's claim where there is either (1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) an intentional failure to determine whether there was any lawful basis for such refusal. Intent that caused the failure may be inferred and imputed to the insurer when there is a reckless indifference to facts or proof reasonably available to it in considering the claim." *Id.*, 63 Ohio St.3d at 699–700, 590 N.E.2d at 1235–1236.

The appellant in this case settled her claim with her insurance carrier and seeks compensation for bad faith in the adjusting of the claim. In *Eastham v. Nationwide Mut. Ins. Co.* (1990), 66 Ohio App.3d 843, 586 N.E.2d 1131, the court held:

"Based on the relationship between an insurer and its insured, an insurer has the duty to act in good faith in the handling and payment of the claims of its insured, and a breach of this duty will give rise to a cause of action against the insurer. *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272, 6 OBR 337, 452 N.E.2d 1315. This cause of action lies in tort irrespective of any liability arising from a breach of the underlying contract. *Staff Builders, Inc. v. Armstrong* (1988), 37 Ohio St.3d 298, 525 N.E.2d 783. However, the insurer's duty of good faith and fair dealing derives from and exists solely because of its contractual relationship with its insured. See *Gruenberg v. Aetna Ins. Co.* (1973), 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032." *Id.*, 66 Ohio App.3d at 846, 586 N.E.2d at 1133.

The appellant has presented a question of fact sufficient to require the denial of a motion for summary judgment on the issue of bad faith. The appellant stated that Applegate dissuaded her from continuing medical care, stating that the doctors were taking advantage of her, and that her policy had limits which would not cover additional medical services. The appellant's deposition reflects that she continued to question statements made by the adjuster, and that Applegate used the term "no fault" in the context of discussing the fact that she would have to prove the other driver at fault in order to recover under the uninsured motorist provision of her insurance contract.

But more egregiously, the record reflects a handwritten memo from the adjuster to the appellant which clearly misrepresents the type of policy purchased by the appellant. Such a misstatement appears designed to discourage an insured from pursuing a claim.

In the aggregate, these representations by an adjuster to the insured are sufficient to withstand a motion for summary judgment. Appellant's second assignment of error is well taken.

Last, this court is forced to recognize that appellate counsel for the appellee has tried to mislead this court as to the level of the appellant's education. Page 3 of the appellee's brief states: "Appellant, Cindy Pizzino, is well educated. She graduated from high school in 1973, attended Ohio State University, and actually studied law at the University of South Carolina (Aug. depo. P. 8–9)." Although factually correct, a perusal of the deposition reveals that this statement is far from complete. The transcript reads:

"Q. Have you ever been in the military?

"A. Yes, U.S. Air force.

"Q. During what years?

"A. '77, '78.

"Q. What did you do in the Air Force?

"A. Propeller mechanic.

"Q. What is the highest rank that you achieved?

"A. Airman first class.

"Q. What type of discharge did you receive?

"A. Honorable.

"Q. That was in 1978?

"A. Yes.

"Q. Any reserve service?

"A. No.

"Q. How far did you go in school?

"A. About a total of 17 years.

"Q. Tell me, you graduated from high school?

"A. Yes, 1973.

"Q. Where?

"A. Perry.

"Q. Where did you go after that?

"A. Ohio State University.

"Q. During what years?

"A. '75, '76.

"Q. What did you study?

"A. Pre-vet.

"Q. What else?

"A. University of South Carolina.

"Q. What did you study there?

"A. Law. University or Lakeland Community College.

"Q. What did you study there?

"A. Law.

"Q. Where else?

"A. North American School of Animal Science.

"Q. When?

"A. '79, '80.

"Q. Do you have any degrees from any of those schools?

"A. I have one more school. I have a degree, technicians degree from the animal science, and I went to West Side Institute.

"Q. Any other schooling you haven't told me about?

"A. West Side Institute of Technology.

"Q. For what?

"A. I have a building engineer's degree and a boiler operator's license, third class.

"Q. Any other schooling?

"A. No."

At the continuation of the deposition in December, further questions were asked of the appellant regarding her education at pages 6–7:

"Q. At the time of your last deposition you indicated that you had spent some time at the University of South Carolina and that you studied law?

"A. Yes.

"Q. Specifically what did you study? What type of law or under what circumstances did you study?

"A. It was like for security work. It was prelaw.

"Q. That would have been criminal law then?

"A. More or less, yes.

"Q. No civil law?

"A. No.

"Q. Nothing relating to personal injury law, relating to personal injury cases?

"A. No, I do not want to know about that."

This court will not countenance such disingenuousness, and counsel is so advised.

Appellant's second and third assignments of error are well taken.

The judgment is reversed and the cause is remanded to the trial court.

*Judgment reversed*
*and cause remanded.*

JOHN F. CORRIGAN, P.J., PATTON and JAMES D. SWEENEY, JJ., concur.