JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Plaintiffs-appellants, Lushion White ("White") and Lisa Rice ("Rice") (collectively referred to as "appellants"), appeal from the trial court's decisions that granted defendants-appellees', A.R. Goodman Enterprises, Inc. ("Goodman") and Allstate Insurance Company's ("Allstate"), motions for summary judgment and the order that denied White's partial motion for summary judgment. For the reasons that follow, we affirm in part, reverse in part and remand.
 {¶ 2} This action is a consolidation of two lawsuits filed by appellants concerning home repairs and insurance coverage arising after White's property was damaged by fire in September 1998. Appellants commenced an action in July 2003 alleging breach of contract, respondeat superior, and bad faith against Allstate; and breach of express, implied and quasi contract, against Goodman. In January 2005, White filed a separate action against Goodman (serving the company at three different addresses) seeking a declaratory judgment and money damages for alleged violations of the "Home Sales Solicitation Act" ("HSSA") and the "Consumer Sales Practices Act" ("CSPA"). The actions were consolidated and Allstate, Goodman, and White each moved for summary judgment.
 {¶ 3} The trial court granted summary judgment in favor of Goodman and Allstate and denied White's motion for partial summary judgment. White and Rice appeal these rulings and assert three assignments of error for our review, which we *Page 4 
will address in the order asserted and together where it is appropriate for discussion.
 {¶ 4} "I. White is entitled to partial summary judgment on the issue of liability, only, against Goodman for its violation of the HSSA and CSPA.
 {¶ 5} "II. The trial court erred in granting summary judgment in favor of Goodman."
 {¶ 6} Goodman asserts that the trial court's denial of White's motion for partial summary judgment is not a final, appealable order. Where, as here, the trial court's granting of a parties' summary judgment motion results in a final order, the court's corresponding denial of the opponent's motion for summary judgment constitutes a final appealable order. See Civil Serv. Emples. Ass'n v. City of Cleveland, Cuyahoga App. No. 87784, 2006-Ohio-6595; see, also, Weeks v. Emergency Servs. (Dec. 14, 2000), Cuyahoga App. No. 76902 (holding "[t]he granting of defendants' summary judgment motion is overruled, and the denial of the plaintiff's partial motion for summary judgment is reversed.")
 {¶ 7} Accordingly, we must address each of appellant's assigned errors relative to the trial court's various summary judgment rulings.
 Summary judgment standard of review {¶ 8} An appellate court reviews a trial court's grant of summary judgment de novo. Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102,105. De novo review *Page 5 
means that this Court uses the same standard that the trial court should have used, and we examine the evidence to determine if, as a matter of law, no genuine issues exist for trial. Brewer v. Cleveland CitySchools (1997), 122 Ohio App.3d 378, citing Dupler v. MansfieldJournal (1980), 64 Ohio St.2d 116, 119-120.
 {¶ 9} Summary judgment is appropriate where it appears that: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. Harless v.Willis Day Warehousing Co., Inc. (1978), 54 Ohio St.2d 64, 66; Civ.R. 56(C).
 {¶ 10} The burden is on the movant to show that no genuine issue of material fact exists. Id. Conclusory assertions that the nonmovant has no evidence to prove its case are insufficient; the movant must specifically point to evidence contained within the pleadings, depositions, answers to interrogatories, written admissions, affidavits, etc., which affirmatively demonstrate that the nonmovant has no evidence to support his claims. Dresher v. Burt (1996), 75 Ohio St.3d 280, 293; Civ.R. 56(C). Unless the nonmovant then sets forth specific facts showing there is a genuine issue of material fact for trial, summary judgment will be granted to the movant. *Page 6 
 {¶ 11} White moved for partial summary judgment on the issue of liability as to his claims against Goodman for violation of the HSSA and CSPA. Goodman moved for summary judgment on all of appellants' claims against it.
 {¶ 12} A "Home solicitation sale" is defined by R.C. 1345.21 as:
 {¶ 13} "a sale of consumer goods or services in which the seller or a person acting for the seller engages in a personal solicitation of the sale at a residence of the buyer, including solicitations in response to or following an invitation by the buyer, and the buyer's agreement or offer to purchase is there given to the seller or a person acting for the seller, or in which the buyer's agreement or offer to purchase is made at a place other than the seller's place of business. * * *"[1]
 {¶ 14} "[H]ome improvement contracts generally fall within the purview of the HSSA." Kamposek v. Johnson, Lake App. No. 2003-L-124,2005-Ohio-344, Tf17, citing Patterson v. Stockert (Dec. 13, 2000), 5th Dist. No. 2000AP 01 0002.
 {¶ 15} The failure to comply with the HSSA constitutes a deceptive act or practice in connection with a consumer transaction in violation of the CSPA. R.C. 1345.21 to 1345.27; R.C. 1345.02. Thus, any violation of the HSSA is a violation of the CSPA. See R.C. 1345.28.
 {¶ 16} White has not alleged violations of the CSPA independent of any violations of the HSSA. Rather, he asserts that Goodmans' failure to comply with the *Page 7 
HSSA writing requirements of R.C. 1345.23(A) and (B) (the Notice of Cancellation) is a violation under CSPA.
 {¶ 17} Goodman counters that the acts complained of do not fall under the HSSA. Goodman advances six arguments: (1) that HSSA does not apply because White was not residing in the property; (2) White is not a "buyer" under HSSA because Allstate paid for the repairs; (3) White failed to comply with R.C. 1345.22 necessary to effectuate a proper cancellation under HSSA; (4) he waived his rights to cancel the contract by filing a complaint for damages; (5) he is estopped from canceling his contract due to substantial completion; and (6) Goodman did not knowingly violate the CSPA.
 {¶ 18} Goodman contends that the subject property was not "a residence of [White]" as required for HSSA to apply. The subject property is located at 3449 Daleford Road in Shaker Heights, Ohio (the "Property"). According to White, the Property is a double "three on the third floor, three on the second floor, and the third floor has two studio-type apartments with no cooking privilege, and there was an individual living in one at the time the fire broke out on the third floor."
 {¶ 19} White contends that HSSA applies regardless of whether a buyer's residence is involved if "the buyer's agreement or offer to purchase is made at a place other than the seller's place of business." White miscontrues the statute. The provision defines "Home solicitation sale" to mean "a sale of consumer goods or *Page 8 
services * * * in a personal solicitation of the sale at a residenceof the buyer * * * and the buyer's agreement * * * isthere given or in which the buyer's agreement is made at a place other than the seller's place of business * * *." R.C. 1345.21(A), emphasis added. The solicitation must originate at a buyer's residence in the first place. Thereafter, the buyer's agreement to purchase the service can occur either at the residence or somewhere else with the sole exception of the seller's place of business. To provide that a "home solicitation sale" would include all transactions where "the buyer's agreement is made at a place other than the seller's place of business" is overly broad and nonsensical in that it would cover the sale of consumer goods or services without a "home" even being involved.
 {¶ 20} Goodman maintains that the Property was "rental property" and not "a residence" of White. White testified that he purchased the Property and obtained a homeowner's insurance policy from Allstate to cover it. The policy provided homeowner's insurance for the Property for the period between July 31, 1998 through July 31, 1999. The fire occurred a few months after White purchased the Property. It is undisputed that the property was a dwelling used as a home.
 {¶ 21} White was asked "Did you purchase this house to live in or to rent?" to which he responded "[t]o live in." He further stated that his daughter, Lisa Rice, was going to live there with him as she had already been living there as a tenant when he purchased the home. Later, White again stated it was his intention to move into the *Page 9 
Property with his daughter and he was not going to charge his daughter any rent. The fire occurred before White moved into the Property.
 {¶ 22} After the fire occurred, White did not contact any contractors concerning repairs. He received one estimate for repairs from Goodman. White stated:
 {¶ 23} "The next day after the fire I went by the house to investigate the damage for the first time and Goodman was in the driveway. I met him in the driveway of the property. * * * [T]he house was boarded up and the man who did the boarding up was in the driveway, and we talked along with the Allstate representative about the fire job and the amount of damage to the house. * * * My understanding is that Allstate had called them to show up."
 {¶ 24} White hired Goodman to make the repairs.
 {¶ 25} Goodman relies on Mainwold Bros v. Ziarno (Nov. 20, 1998), Lucas App. No. L-97-1429, in urging us to conclude that the Property was not a "residence" of White as contemplated by HSSA because he did not actually live there at the time he entered the contract for repair services with Goodman. The court in Mainwold, however, declined to address the HSSA claim as it was not asserted in the lower court. Although the court provided some reasoning in footnote 1 that HSSA may not apply because the buyer did not reside in his home at the time of the sale, it also noted that the transaction would have been excluded from HSSA under R.C. 1345.21(A)(4). Thus, this dicta lends little persuasive, and no precedential, value to the issue that is presently before us. *Page 10 
 {¶ 26} The interpretation of the phrase "a residence of the buyer" is the subject of dispute. The term residence is not defined in the statute. "In the absence of clear legislative intent to the contrary, words and phrases in a statute shall be read in context and construed according to their plain, ordinary meaning." Muczyk v. Cleveland StateUniv. (1996), 111 Ohio App.3d 167, 169, citing Kunkler v. Goodyear Tire Rubber Co. (1988), 36 Ohio St.3d 135, 137. "Residence" is defined to include "the act or fact of dwelling in a place for some time * * * a building used as a home * * *." Webster's New Collegiate Dictionary, 1977.
 {¶ 27} The use of the term "a" rather than "the" supports a finding that the intention of HSSA was to afford protection for more than one residence of the buyer, such as vacation homes and the like. The Daleford property was "a residence" that belonged to White and therefore fell within coverage of HSSA as a matter of law. Goodman was not entitled to summary judgment on this basis.
 {¶ 28} We next address whether there was some other basis to grant Goodman's motion for summary judgment on these claims.
 {¶ 29} Goodman contends that White was not a "buyer" under HSSA because Allstate paid or reimbursed White for the repairs made by Goodman. It is clear that Allstate made the payments on behalf of White as it was required to do pursuant to the homeowner's insurance policy White had purchased from it. Albeit with *Page 11 
Allstate's endorsement,[2] White was the one who entered the contract with Goodman. The contention that White was not the "buyer" is without merit and Goodman was not entitled to judgment on this basis.
 {¶ 30} Goodman maintains that White failed to exercise any right to cancel the contract under R.C. 1345.22, which provides that:
 {¶ 31} "In addition to any right otherwise to revoke an offer, the buyer has the right to cancel a home solicitation sale until midnight of the third business day after the day on which the buyer signs an agreement or offer to purchase. Cancellation is evidenced by the buyergiving written notice of cancellation to the seller at the addressstated in the agreement or offer to purchase. The buyer may deliver the notice by mail, telegram, manual delivery, or other personal delivery. Written notice of cancellation shall be effective upon the date of postmarking. Telegram delivery is effective when the telegram is ordered. Manual delivery or other personal delivery is effective when delivered to the seller or to the seller's address, whichever comes first. Notice of cancellation need not take a particular form and is sufficient if it indicates, by any form of written expression, the intention of the buyer not to be bound by the home solicitation sale. Notice of buyer's right to cancel must appear on all notes or other evidence of indebtedness given pursuant to any home solicitation sale. *Page 12 
 {¶ 32} "Where a home solicitation sale requires a seller to provide services, he shall not commence performance of such services during the time in which the buyer may cancel."
 {¶ 33} White contends that Goodman failed to give him proper notice of his right to cancel as required by law. Goodman does not dispute White's claim that it did not give him notice of the buyer's right to cancel in its contract with him.[3] Instead, Goodman argues that White cannot avail himself of cancellation because he did not provide it with his notice of cancellation. Goodman maintains White only provided the notice to Goodman's attorney. White counters that he served Goodman directly with the notice, which was part of his complaint in the second case. The record indicates that Goodman did receive service of that complaint at the following addresses: 30799 Pinetree Road, #406, Cleveland, Ohio 44124 and 26650 Renaissance Parkway, Cleveland, Ohio 44128.
 {¶ 34} Next, Goodman claims that White is precluded from cancellation because he elected his remedy by first filing an action for damages under the contract. White concedes that at some point he will be required to elect between these inconsistent claims but maintains he is permitted by the Civil Rules to maintain *Page 13 
alternate inconsistent claims. Civ.R. 8(E). This is true. E.g.,Kamposek, 2005-Ohio-344, ¶¶ 23-34.
 {¶ 35} In Kamposek, the Eleventh District Court of Appeals dealt with a similar situation and held that "a buyer may not recover on two different theories for damages, but a buyer may assert alternative theories for recovery * * *." Id. at 26. Where HSSA applies to a transaction, the buyer may cancel a contract at any time prior to receiving notice of right to cancel from the seller. "If the sale is a service contract, the seller is not permitted to begin performance of the contract until the three-day period for the buyer to cancel has expired." Id. at ¶ 25 (this "put[s] the risk of loss on the seller if performance is begun prior to expiration of the buyer's right to cancel.")
 {¶ 36} While Goodman relies on Rosenfield v. Tombragel (Dec. 31, 1996), Hamilton App. C-950871, it is not analogous to the factual posture of this case. In Rosenfield, the claimant had been awarded a specific amount in monetary damages thus precluding the pursuit of the inconsistent remedy of recission. Here, White has not prevailed on his claims for damages and, in fact, the trial court granted summary judgment in Goodman's favor on them. White may not recover both damages and also cancel the contract; however, he is not precluded at this point from pursuing these inconsistent claims. Civ.R. 8(E).
 {¶ 37} Where the buyer exercises the right to cancel, there is "no reason to turn to the recission provision of R.C. 1345.09."Kamposek, 2005-Ohio-344, 4|27. *Page 14 
 {¶ 38} As White maintains he is not seeking recission of the contract under the CSPA, Goodman's arguments in this respect are moot. The remaining issue raised by Goodman concerning White's ability to recover attorney fees under CSPA is premature and will not be addressed in an advisory fashion.
 {¶ 39} Based on the foregoing, the trial court erred by granting Goodman's motion for summary judgment on White's claims under HSSA and the dependent claims under CSPA and by denying White's partial motion for summary judgment as to liability on these claims.
 {¶ 40} The trial court granted Goodman's motion for summary judgment on the claims advanced by Rice, and this was appropriate. Rice had no contractual relationship with Goodman and was not the owner of the Property. White simply allowed Rice, his daughter, to continue living in the Property, where she had been a tenant prior to his purchase of it. There is no genuine issue of material fact concerning Rice's claims against Goodman, which fail as a matter of law.
 {¶ 41} The trial court also granted Goodman's motion for summary judgment on White's remaining claims against it. The trial court properly entered judgment in Goodman's favor on the quasi and implied contract claims because there was an express contract between White and Goodman. See Hughes v. Oberholzer (1954), 162 Ohio St. 330. It is not in dispute that there was an express contract between White and Goodman. However, the record is replete with evidence that Goodman may have breached its contract with White to perform repairs to the Property in a *Page 15 
workmanlike fashion. Accordingly, the trial court erred by granting Goodman's motion for summary judgment on this claim.
 {¶ 42} Assignments of Error I and II are overruled in part and sustained in part as follows: the trial court's judgment denying White's motion for partial summary judgment is reversed; the trial court's judgment granting Goodman's motion for summary judgment on Rice's claims is affirmed; the trial court's judgment granting Goodman's motion for summary judgment on Whites' claim for breach of contract, and claims under HSSA and CSPA is reversed; and the trial court's summary judgment dismissal of White's claims for breach of implied and quasi contract is affirmed.
 {¶ 43} "III. The trial court erred in granting summary judgment in favor of Allstate."
 {¶ 44} Here, White claims that Allstate acted in bad faith and is in breach of contract for failing to comply with the terms of the homeowner's insurance policy. White also seeks to hold Allstate liable under the doctrine of respondeat superior.
 {¶ 45} "An insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor. (Hart v. Republic Mut Ins. Co. [1949], 152 Ohio St. 185, 39 O.O. 465, 87 N.E.2d 347; Staff Builders, Inc. v. Armstrong [1988],37 Ohio St.3d 298, 525 N.E.2d 783, approved and followed; Slater v.Motorists Mut. *Page 16 Ins. Co. [1962], 174 Ohio St. 148, 21 O.O.2d 420, 187 N.E.2d 45, paragraph two of the syllabus, overruled; Motorists Mut. Ins. Co. v.Said [1992], 63 Ohio St.3d 690, 590 N.E.2d 1228, overruled to the extent inconsistent herewith.)" Zoppo v. Homestead Ins. Co. (1994),71 Ohio St. 3d 552, paragraph 1 of the syllabus.
 {¶ 46} Allstate made various payments under the policy to White in excess of $200,000. However, a dispute arose concerning White's entitlement to additional monies for repairs that were allegedly needed to complete and repair Goodman's work. Allstate agreed to pay a certain amount for the repairs but conditioned it upon White executing a release.
 {¶ 47} The parties agree that Allstate's policy with White provided fire coverage in excess of $300,000. The record reflects that the policy limits were not exhausted at the time that Allstate stopped making payments to White.
 {¶ 48} White, dissatisfied with Goodman's performance, sought estimates from other contractors to complete the repairs. Insurance Restoration Services first estimated the cost of the remaining repairs to be in excess of $58,000. However, after meeting with Allstate, Insurance Restoration Services reduced the estimated cost of the remaining repairs to $22,813.39.[4] A third estimate was provided by Cairns Construction in the amount of $45,423.06. *Page 17 
 {¶ 49} While Allstate claims that appellants refused its offer to pay an additional $22,813.39, White contends that such payment was wrongfully conditioned upon him executing a release.[5] Despite the multiple estimates to complete and/or correct the Goodman repairs, Allstate made no further payments to appellants. Allstate argues that the payments it made to appellants for food, lodging, and transportation are evidence that it did not act in bad faith. Nonetheless, Allstate did not dispute those costs and paid them; that does not relieve them from the contractual obligation to pay up to the contractual limits for a covered loss. Appellants maintain that by failing to pay for the repairs, Allstate breached the policy and acted in bad faith.
 {¶ 50} It is appellants' position that Allstate had no legitimate or contractual basis to compel them to execute a release as a condition of receiving further payments under the policy. Allstate counters that appellants failed their contractual duty to cooperate, thereby precluding recovery under the policy. Allstate also suggests that White refused its payment not because it requested a release but because he did not agree with the estimate. As illustrated by each side's contentions and the record, there are genuine issues of material fact on appellants' *Page 18 
allegations of breach of contract and bad faith. We reject Allstate's contention that failing to accept an offer of settlement constitutes failure to cooperate.
 {¶ 51} Lastly, we address appellants' respondeat superior claims.
 {¶ 52} "[T]he doctrine of respondeat superior is applicable to the relation of master and servant or of principal and agent, but not to that of employer and independent contractor. [Citations omitted.] The relation of principal and agent or master and servant is distinguished from the relation of employer and independent contractor by the following test: Did the employer retain control, or the right to control, the mode and manner of doing the work contracted for? If he did, the relation is that of principal and agent or master and servant. If he did not but is interested merely in the ultimate result to be accomplished, the relation is that of employer and independent contractor. [Citations omitted.]" Miller v. Metropolitan Life Ins.Co. (1938), 134 Ohio St. 289, 291-292.
 {¶ 53} There is no evidence to suggest that Allstate controlled the mode or manner in which Goodman performed the repairs on the Daleford property. Further, Goodman is not an employee of Allstate.
 {¶ 54} Appellants rely on various provisions from Allstate's "QVP program" and its Claim Policy Practices and Procedures Manual to support its claim that Allstate guaranteed Goodman's work, which include:
 {¶ 55} "The guarantee assures the policyholder or claimant that the quality of workmanship provided by the QVP repair firm recommended by Claim Adjuster will *Page 19 
meet generally accepted standards in the home repair industry, and, if such standards are not met, that Allstate will remedy any departure from them." The Manual also directed that "if a policyholder or third-party claimant has no preference * * * the Claim Adjuster should recommend one or more QVP repair firms known for doing quality work at fair prices. In some instances the policyholder or third-party claimant may have already made a decision of a firm prior to reporting the claim, and, if a QVP firm, the settlement qualifies for issuance of the Guarantee."
 {¶ 56} Munoz, Allstate's representative, testified that Allstate "had them [A.R. Goodman] as part of the Quality Vendor Program." Goodman was at White's house, already working, and with Munoz, when White arrived to assess the fire damage. With Munoz's assurances, White entered a contract with Goodman, a repair firm in Allstate's Quality Vendor Program.
 {¶ 57} According to White, Munoz made it seem like Goodman was Allstate's contractor as reflected in the following excerpt from White's deposition:
 {¶ 58} "[D]id Allstate ever tell you that they were going to guarantee the work of A.R. Goodman?
 {¶ 59} "A: I was led to believe that. It was not said, we'll guarantee the work, but at the time I met with Mr. Goodman and Allstate representative Mr. Munoz in the driveway, they both talked very freely about the amount of work he had done for Allstate and he was their contractor and that I could rest assured that he had done *Page 20 
these kind of jobs with Allstate in the past and I could feel that he would do a good job * * *."
 {¶ 60} Thus, if Allstate were held accountable for Goodman's work it would be pursuant to the guarantee and not respondeat superior liability. Accordingly, the trial court did not err in granting Allstate's motion for summary judgment on appellants' respondeat superior claims.
 {¶ 61} This assignment of error is sustained in part and overruled in part. The trial court's decision granting Allstate's motion for summary judgment on appellants' claims of breach of contract and bad faith are reversed; the trial court's decision granting summary judgment in favor of Allstate on appellants' claim of respondeat superior is affirmed.
 {¶ 62} Judgment affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.
It is ordered that appellants and appellees shall each pay their respective costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 21 
JAMES J. SWEENEY, ADMINISTRATIVE JUDGE
CHRISTINE T. McMONAGLE, J., and MARY J. BOYLE, J., CONCUR
[1] While the statute enumerates various exceptions, neither party contends that any of those apply in this case.
[2] Goodman was listed as a preferred vendor in Allstate's Quality Vendor Program.
[3] The record contains an "Assignment/Appraisal" dated September 24, 1998 that is signed by Goodman and White and it contains a reference to a "Notice of Cancellation," which was not attached.
[4] Munoz testified that Allstate negotiated the cost of repairs to the amount of $22,455.94. However, the affidavit of Kim Werling, Staff Claim Adjuster for Allstate, avers that "Allstate offered to pay a maximum of $22,813.39 for completion of repairs, which Mr. White and Lisa Rice felt were not done or inadequately done by A.R. Goodman."
[5] Correspondence from Munoz reflects that payments for "supplemental work to be performed at [White's] home" would be issued after White signed a "formal release" and returned it to Munoz. *Page 1