[Cite as *Crawford v. Am. Family Ins. Co.*, 2024-Ohio-5345.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| LESLIE CRAWFORD | : | |
| | : | |
| Appellant | : | C.A. No. 30157 |
| | : | |
| v. | : | Trial Court Case No. 2019 CV 05973 |
| | : | |
| AMERICAN FAMILY INSURANCE COMPANY ET AL. | : | (Civil Appeal from Common Pleas Court) |
| | : | |
| Appellees | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on November 8, 2024

. . . . . . . . . . .

JOHN A. SMALLEY, Attorney for Appellant

JONATHON L. BECK & NATALIE M.E. WAIS, Attorneys for Appellees

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Plaintiff-Appellant, Leslie Crawford, appeals from a summary judgment granted in favor of Defendant-Appellee, American Family Insurance Company ("AFIC").

In a single assignment of error, Crawford contends the trial court erred in granting AFIC summary judgment because genuine issues of material fact exist concerning whether AFIC acted in bad faith in handling Crawford's uninsured motorists ("UM") claim. Additionally, Crawford maintains there are genuine issues of material fact concerning her claim for punitive damages.

{¶ 2} After reviewing the record, we agree with Crawford and will sustain her sole assignment of error. The judgment therefore will be reversed, and this cause will be remanded to the trial court for further proceedings.

## I. Facts and Course of Proceedings

{¶ 3} This is the second time Crawford's case has been before us. *See Crawford v. Am. Family Ins. Co.*, 2023-Ohio-1069 (2d Dist.). As noted there:

> This action arose from an automobile accident that occurred between Crawford and Tonna Marilee Brown on August 10, 2018. On December 16, 2019, Crawford filed a complaint against AFIC and Brown, alleging that Brown was an uninsured driver at the time of the accident and had negligently caused Crawford damage and injury. In a second claim for relief, Crawford alleged that she was insured for uninsured motorists ("UM") coverage with AFIC and that she had complied with all policy provisions. However, AFIC had refused to pay under the terms of the policy. The third claim for relief alleged that AFIC had acted in bad faith in adjusting Crawford's claim.

On February 6, 2020, AFIC filed an answer to the complaint and a cross-claim for subrogation against Brown. After learning that the party who had been served with the complaint had insurance and had not been involved in the accident, Crawford filed an amended complaint on February 26, 2020, naming the correct Tonna Brown at the address listed in the accident report, which was on Gettysburg Avenue in Dayton, Ohio. AFIC then filed an amended answer and cross-claim against Brown on March 11, 2020. However, service attempts at the Dayton address and at a North Carolina address for Brown were unsuccessful.

On March 20, 2020, AFIC asked the court to bifurcate the bad faith claim and stay discovery on bad faith issues until the contract claim was resolved. In response, Crawford agreed to bifurcation but asked the court not to delay discovery. Subsequently, on April 9, 2020, the court granted the motion to bifurcate. However, the court also said it would not stay discovery at that time.

Crawford was finally able to perfect service on Brown and filed a motion for default judgment against her on July 28, 2020. The court then granted a default judgment against Brown on July 29, 2020.

After holding a pretrial conference, the court issued a pretrial order setting a November 1, 2021 jury trial and a summary judgment deadline of August 3, 2021. The case was also referred to mediation, which was held on June 17, 2021, but mediation was unsuccessful. Then, on the joint

request of the parties for a continuance, the trial was continued until July 25, 2022, and the summary judgment deadline was extended to April 26, 2022.

On April 5, 2022, AFIC filed a motion seeking to exclude testimony from Crawford's expert, Matthew Bruder, because he was a member of the law firm representing Crawford and therefore had a financial stake in the outcome of the case. Crawford did not respond to this motion, and there is no record in the file of a court decision on the matter.

On April 29, 2022, Crawford filed a motion asking the court to release documents that had been submitted under seal, and the court, finding the documents discoverable, ordered their release on May 2, 2022. The parties later entered into an agreed protective order stipulating that documents AFIC designated as confidential would be kept confidential. The order also outlined various conditions and provisions related to these documents. On the same day, the court continued the July 25, 2022 trial date and granted AFIC until June 1, 2022, to file a motion for summary judgment.

On June 1, 2022, AFIC filed its motion for summary judgment, and Crawford responded on June 22, 2022. Subsequently, on June 24, 2022, the parties filed an entry of settlement and partial dismissal, indicating that Crawford's first and second claims for relief in the amended complaint had been settled and that the bad faith claim remained pending. On August 5,

2022, AFIC filed a reply memorandum in support of summary judgment.

On September 8, 2022, the trial court filed a decision granting summary judgment to AFIC on the bad faith claim. The court's decision was based solely on the conclusion that "the question of whether American Family acted in bad faith is one that requires expert testimony to answer." Decision, Order and Entry Sustaining Motion for Summary Judgment (Sept. 8, 2022) ("Decision"), p. 4. Because Crawford had not offered expert testimony, the court found that summary judgment was proper.

*Crawford*, 2023-Ohio-1069, ¶ 4-12.

**{¶ 4}** On appeal from that judgment, Crawford raised a single assignment of error alleging the trial court erred in requiring expert testimony for bad faith claims as a matter of law. *Id.* at ¶ 14-15. We agreed, noting first that the parties had not raised the issue in the trial court; instead, the court had independently raised it and not given Crawford a chance to respond. In addition, AFIC had specifically said in the trial court that Crawford did not need a bad faith expert, which was inconsistent with the position it was then taking on appeal. *Id.* at ¶ 19-20. On the merits, we discussed the law on bad faith and concluded that a blanket rule was inappropriate, since laypersons might easily understand some cases. In other complex cases, an expert could be needed. *Id.* at ¶ 21-31. As relevant to the case then before us, we remarked that the adjuster who had handled the case had, in fact, testified during his deposition about the claims process, the meaning of various insurance terms, and standards that apply in evaluating cases. *Id.* at ¶ 32-35.

**{¶ 5}** As an alternate basis for affirming summary judgment in its favor, AFIC argued on appeal that "it had a reasonable basis for its valuation of the claim, and Crawford cannot establish that its decision was 'totally arbitrary.' " *Id*. at ¶ 37. We declined to decide that matter, however, because the trial court had issued a blanket ruling on expert testimony and had not considered any of the evidence presented, including nearly 2,000 pages of the claims file. *Id*. at ¶ 42-44. We reversed the summary judgment and remanded the case to the trial court. Our opinion was issued in late March 2023.

**{¶ 6}** Following remand, the court set an April 8, 2024 trial date, as well as new deadlines for various matters, including disclosing experts, completing discovery, and filing summary judgment motions. AFIC then filed a motion for summary judgment on January 9, 2024, asserting the same arguments that it had on appeal. The motion was supported by the AFIC insurance policy issued to Crawford; an affidavit from the adjuster who handled the claim (Brian Dooley); and an affidavit and September 2, 2021 letter from a legal expert stating that AFIC had reasonable justification for its positions and the claim's value was "fairly debatable," After Crawford responded, the trial court again granted summary judgment to AFIC. This timely appeal followed.

## II. Propriety of Granting Summary Judgment

**{¶ 7}** Crawford's sole assignment of error states that:

The Trial Court Erred in Granting the Defendants-Appellees' Motion for Summary Judgment.

**{¶ 8}** Crawford contends the trial court failed to construe the evidence in her favor as required in deciding summary judgment motions. Consequently, Crawford argues that, even if AFIC presented various points in its favor, a jury could reasonably find AFIC acted in bad faith. In this regard, Crawford points to several matters, including: the adjuster, Dooley, failed to take a statement from Crawford for about nine months, even after one was offered; Dooley used incorrect information that was inconsistent with medical records he possessed; Dooley made no change in his evaluation after finally taking a statement and disregarded new information; and Dooley chose to undervalue the medical expenses for purposes of paying UM benefits while crediting AFIC for a much larger amount it had used in paying the same expenses under the Medical Payments ("med-pay") coverage.

**{¶ 9}** In contrast, AFIC argues summary judgment was proper because Crawford cannot prove that AFIC "had absolutely no reasonable basis to evaluate her claim in the manner it did, and . . . had actual knowledge there was no basis for said evaluation." AFIC Brief, p. 8. According to AFIC, the case before us simply involves a dispute over the claim's value, which was fairly debatable. *Id.* at p. 10.

**{¶ 10}** Before discussing these arguments, we will consider the law pertinent to our review.

### A. Summary Judgment

**{¶ 11}** Ohio law is well-settled concerning summary judgment and applicable review standards. "The procedure set forth in Ohio Civ.R. 56 is modeled after the federal rule that authorizes summary judgment in appropriate cases." *Byrd v. Smith*, 2006-Ohio-

3455, ¶ 10. " 'Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.' " *Id.* at ¶ 11, quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

{¶ 12} "Summary judgment is appropriate if (1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Duncan v. Mentor City Council*, 2005-Ohio-2163, ¶ 9, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977). " 'As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

{¶ 13} In considering summary judgment decisions, appellate courts apply a de novo standard of review. *A.J.R. v. Lute*, 2020-Ohio-5168, ¶ 15. In this type of review, an appellate court independently reviews evidence without deferring to the trial court's findings. *Smathers v. Glass*, 2022-Ohio-4595, ¶ 30, citing *Wilmington Savs. Fund Soc., FSB v. Salahuddin*, 2020-Ohio-6934, ¶ 20 (10th Dist.). Thus, a reviewing court

"examines the evidence available in the record, including deposition or hearing transcripts, affidavits, stipulated exhibits, and the pleadings, *see* Civ.R. 56(C), and determines, as if it were the trial court, whether summary judgment is appropriate." *Id.*, citing *Wilmington* at ¶ 19.

## B. Applicable Law on Bad Faith

{¶ 14} " 'It is well established in Ohio that an insurer has a duty to act in good faith in the settlement of a third-party claim.' " *Crawford*, 2023-Ohio-1069, at ¶ 22, quoting *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 275 (1983). "The reasons for this include an insured party's lack of a voice in policy preparation; the parties' economic disparity; and a claimant's vulnerability and susceptibility to oppression due to his or her grim financial straits at the time of the claim." *Id.* While the case before us involves AFIC's own insured rather than a third-party claim against its insured, the duty here is no different, since insurers must also act in good faith with respect to their own insured parties. *Id.* "A breach of this duty gives rise to a cause of action in tort against the insurer and can include punitive damages in certain circumstances." *Id.*, citing *Hoskins* at paragraphs one and two of the syllabus.

{¶ 15} In the context of lack of good faith in claims handling: "An insurer fails to act in good faith where it denies a claim and such denial is not predicated upon circumstances that furnish reasonable justification therefor." *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552 (1994), paragraph one of the syllabus. "A lack of reasonable justification exists where an insurer refuses to pay a claim in an arbitrary or capricious manner." *Nationwide*

*Mut. Fire Ins. Co.*, 2008-Ohio-174, ¶ 45 (10th Dist.), citing *Nationwide Ins. Ent. v. Progressive Specialty Ins. Co.*, 2002-Ohio-3070, ¶ 19 (10th Dist.). *See also Sutter v. Am. Family Ins. Co.*, 2021 WL 630825, *4 (S.D. Ohio Feb. 28, 2021) (outlining Ohio law on this subject).

{¶ 16} In the context of bad faith, courts have equated the terms "arbitrary" and "capricious," stating "[t]he term 'arbitrary' means 'without fair, solid, and substantial cause and without reason given; without any reasonable cause; * * * fixed or done capriciously or at pleasure; without adequate determining principle; not founded in the nature of things; nonrational; not done or acting according to reason or judgment; depending on the will alone; absolutely in power; capriciously; tyrannical; despotic.' " *Captain v. United Ohio Ins. Co.*, 2010-Ohio-2691, ¶ 30 (4th Dist.), quoting *4D Investments, Inc. v. Oxford*, 1999 WL 8357, *2 (12th Dist. Jan. 11, 1999). (Other citation omitted.)

{¶ 17} With these standards in mind, we will consider the parties' arguments.

## C. Discussion

{¶ 18} As a preliminary point, we disagree with AFIC's claim that Crawford must "produce evidence to establish 'as a matter of law' that AFIC had absolutely no reasonable basis to evaluate her claim in the manner it did." AFIC Brief at p. 8. This is not the standard for summary judgment. As we stressed in our prior opinion in this case, there is a "difference between summary judgment consideration and trial in bad faith cases." *Crawford*, 2023-Ohio-1069, at ¶ 44. Here, Crawford was the non-movant and was not required to "prove" her case as a "matter of law" on summary judgment; she was

only required to "set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E). Furthermore, the party opposing summary judgment is "entitled to have the evidence or stipulation construed most strongly in the party's favor." Civ.R. 56(C).

{¶ 19} AFIC also exaggerates in its assertion that an insured party must show the insurer acted " 'totally arbitrarily' " and had "absolutely no reasonable basis" for questioning a claim. AFIC Brief at p. 9, citing *Helmick v. Republic-Franklin Ins. Co.*, 39 Ohio St.3d 71 (1988), and *Tokles & Son, Inc. v. Midwestern Indemn. Co.*, 65 Ohio St.3d 621 (1992). These cases do not use such terms.

{¶ 20} Furthermore, the language upon which AFIC relies appears to have been taken from a comment in *Tokles*, in which the court said that "a cause of action for the tort of bad faith exists: ' * * * when an insurer breaches its duty of good faith by intentionally refusing to satisfy an insured's claim where there is either (1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) an intentional failure to determine whether there was any lawful basis for such refusal." *Tokles* at 629, quoting *Motorists Mut. Ins. Co. v. Said*, 63 Ohio St.3d at 699-700. *Compare* AFIC Brief at p. 9 (which cites *Tokles* at 629-630, and stresses that "the insured has the burden to produce evidence there was absolutely no basis to question the claim and the insurer knew it in order to avoid summary judgment on bad faith").

{¶ 21} Referring back to the decision in *Said*, the language used at p. 699-700 is also contained in the second paragraph of the syllabus in *Said*. *See Said* at 691. However, *Said* was overruled in *Zoppo*, 71 Ohio St.3d 552, which held that "actual intent is not an element of the tort of bad faith." *Id*. at 554. Specifically, in *Zoppo*, the court

stated that:

> Until *Said*, the element of intent had been notably absent from this court's definition of when an insurer acts in bad faith. In fact, with the exception of *Said* and the four-to-three decision of *Slater v. Motorists Mut. Ins. Co.* (1962), 174 Ohio St. 148 . . ., over the past forty-five years this court has consistently applied the "reasonable justification" standard to bad faith cases. According to this standard, first announced in 1949 in the case of *Hart v. Republic Mut. Ins. Co.* (1949), 152 Ohio St. 185 . . . , and reaffirmed in *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272 . . ., and *Staff Builders, Inc. v. Armstrong* (1988), 37 Ohio St.3d 298 . . . , "an insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Id.* at 303, . . . . Intent is not and has never been an element of the reasonable justification standard. Hence, in deciding *Said, supra*, and in relying upon the erroneous *Slater* decision, this court departed from forty-five years of precedent. By expressly overruling *Said* and *Slater,* we will be following the logical progression of case law that has developed over the years.

*Zoppo*, 71 Ohio St.3d at 554-555. Research indicates that the Supreme Court of Ohio has not changed the approach it followed in *Zoppo*. Consequently, the standard AFIC describes is simply incorrect.

{¶ 22} Turning now to the trial court's decision, the factual discussion briefly

mentioned two paragraphs of Dooley's affidavit and several pages of Dooley's deposition, from which the court found no genuine issue of material fact about whether AFIC had acted in bad faith. Decision, Order, and Entry Sustaining Motion for Summary Judgment ("Decision") (May 1, 2024), p. 4-5. In particular, the court noted that: "Not only did Mr. Dooley testify that he agrees these types of claims cannot be evaluated using a 'cookie-cutter' method, but he set forth credible detail regarding the review of Plaintiff's claim, including the facts and circumstances unique to Plaintiff's specific injuries, pain, and treatment." *Id.* at p. 5.

**{¶ 23}** Notably, in deciding summary judgment motions, "a court must not 'consider either "the quantum" or the "superior credibility" of evidence.' " *Natl. City Real Estate Servs. LLC v. Frazier*, 2018-Ohio-982, ¶ 25 (4th Dist.), quoting *McGee v. Goodyear Atomic Corp.*, 103 Ohio App.3d 236 (4th Dist. 1995). " 'The purpose of summary judgment is not to try issues of fact, but rather to determine whether triable issues of fact exist. . . . Thus, a court should not pass upon the credibility of witnesses or weigh the relative value of their testimony in rendering summary judgment.' " *Id.*, quoting *McGee* at 242-243. *See also Hickory Grove Investors, Ltd. v. Jackson*, 2008-Ohio-6428, ¶ 28 (10th Dist.) (same); *Allstate Ins. Co. v. Pittman*, 2015-Ohio-699, ¶ 22 (2d Dist.) (a trial court's primary function " 'in reviewing a motion for summary judgment is to determine whether triable issues of fact exist, not the sufficiency of those facts' ").

**{¶ 24}** In considering this matter, we have reviewed the entire factual record, including: the affidavits submitted with AFIC's summary judgment motion; the depositions of Leslie Crawford and the AFIC claims adjuster, Brian Dooley; and the voluminous claims

file (labeled AmFam000044 – AmFam002379).   Construing the facts in Crawford's favor, as required, we note the following facts.

**{¶ 25}** On August 10, 2018, Crawford was involved in an auto accident when an uninsured driver in the opposing lane of travel abruptly turned left in front of Crawford's car.   As a result of the collision, the airbags deployed, and Crawford's vehicle was severely damaged.   Crawford hit her hands and ankle on something in the car; her left hand hit the windshield and her right ankle hit the brake.   She was taken to the hospital in an ambulance and reported chest pain, left hand pain, and bilateral knee pain.   X-rays were normal.   When it came time to leave the hospital, Crawford discovered she could not walk.   As a result, her right ankle was wrapped and she was discharged in a wheelchair, with a prescription for Motrin.   AmFam000121-000123, 000142-000143, 000149, and 000191; Dooley Deposition, 28-29; and Crawford Deposition, 13.

**{¶ 26}** The accident occurred on a Friday morning as Crawford was traveling to work, and she did not go to work that day.   At the time, Crawford was employed as a teacher and was involved in training before school started.   While she returned to work the Monday after the accident, she was on light duty and other teachers helped in setting up her classroom.   Crawford was on crutches for a week and then began to be able to put weight on her ankle.   She did not have a family doctor at that time, so there was some delay in getting an appointment.   On August 23, 2018, Crawford saw a nurse practitioner and complained of rib pain and that her left thumb felt jammed and in pain. Crawford also said her right ring finger and hand hurt, her right ankle hurt, and her chest hurt from the airbag being deployed.   The August 23, 2018 physical exam showed

decreased range of motion and tenderness in the right and left wrist and left foot, and decreased range of motion, tenderness, and swelling in the right ankle. Low back and neck pain was also documented. The nurse practitioner prescribed medication and ordered x-rays of the right ankle and right hand, as well as a physical therapy consultation. AmFam000125, 000150, 000262-000266, and 001900.

{¶ 27} On September 4, 2018, Dooley took a recorded statement from Crawford, during which Crawford discussed the accident and issues she was having at that time. The interview lasted about ten minutes. Previously, on the day of the accident, another AFIC adjuster had done a recorded interview of about the same duration and had obtained some preliminary details. On September 13, 2018, the scheduled x-rays were taken of Crawford's right hand and ankle. There were no fractures, but there was soft tissue swelling along the left medial aspect of the ankle. The previous day, Crawford's attorneys had sent Dooley notice that they were representing her; Dooley acknowledged this in a September 17, 2018 letter. At that time, Dooley sent employment and medical information authorizations for Crawford to sign. He also asked for complete medical records and itemized bills. *Id.* at 000147-000152, 000139-000146, 000195, 000198, 000270, 002344-002348, and 002349-002351.

{¶ 28} At the time of the accident, Crawford's insurance policy with AFIC had policy limits of $10,000 for med-pay coverage and $25,000 for UM coverage. *Id.* at 00154. Crawford made claims under both coverages. Under the insuring agreement for UM coverage, AFIC agreed to "pay compensatory damages for bodily injury which an **insured person** is legally entitled to recover from the owner or operator of an **uninsured motor**

**vehicle**." (Emphasis in original.) *Id.* at 000174. The section entitled "Limits of Liability" for UM coverage also stated that:

4. This insurance shall be excess over, and shall not pay again, any medical expenses already paid under the Medical Expenses coverage of this policy.

5. No **insured person** will be entitled to receive duplicate payments for the same elements of loss. Any amount we pay under this coverage to or for an **insured person** will be reduced by any payment made to that person under any other coverage of this policy.

(Emphasis in original.) AmFam000175.

**{¶ 29}** Concerning med-pay coverage, AFIC agreed to pay for "**usual and customary medical expenses** . . . incurred . . . because of bodily injury sustained to an **insured person** as the result of an accident." (Emphasis in original.) *Id.* at 000179. Regarding liability limits for med-pay, the policy further stated that:

3. No one will be entitled to duplicate payments for the same elements of loss. Any amount **we** pay to or for an injured person applies against any other coverage applicable to the loss so that there is no duplication of payment. In no event shall a coverage limit be reduced below any amount required by law.

(Emphasis in original.) *Id.*

**{¶ 30}** In October 2018, the med-pay adjuster indicated to various medical providers that med-pay payments had been "pended" at the request of Crawford's

attorney.   *E.g.*, AmFam001060-001064 and 1070-1089.

{¶ 31} As noted, Crawford was referred for therapy, which occurred at Miami Valley Hospital ("MVH").   There was a slight delay in beginning therapy, as Crawford lacked transportation.   For more than four months, Crawford attended physical therapy for her neck, ankle, and back and occupational therapy for her hands.   This period was from October 11, 2018, through February 26, 2019.   *Id.* at 000124, 000278-000320, 000325-000415, 000420-000512, 000516-000523, 000528-000535, 000540-000555, 000560-000566, 000568-000580, and 001303-001334.   Without discussing in detail the therapy records (which are voluminous), we note that Crawford described her pain on a scale of one to 10 when therapy began as follows: (1) 0/10 pain in the neck at rest but stiffness and pain of 3-4/10 at worst; (2) 0/10 pain in the right lateral trunk at rest and 6/10 low back pain at worst; (3) 3-4/10 pain in the right ankle at rest and 5-6/10 pain at worst; (4) 0/10 pain for the right thumb and left 4th finger at rest, and 3-4/10 pain at worst.   *Id.* at 000280.

{¶ 32} At the end of January 2019, Crawford reported pain in her right ankle at 4/10 at that time and 6/10 at worst.   The physical therapy testing at that time indicated 70% functionality in the ankle with limited range of motion and strength.   *Id.* at 000540 and 000542-000543.   At the last physical therapy session for the right ankle on February 26, 2019, the pain and testing were essentially unchanged, with pain being 3-4/10 at that time and at worst still 6/10.   At that session, Crawford still had limited range of motion and strength and 70% function, and most therapy goals had not been met.   Crawford had two authorized visits left from her health insurer and declined further treatment.   *Id.*

at 001321-001326.    During physical therapy, Crawford did report by December 17, 2018, that she had no pain in her back and neck.    *Id.* at 000490.

{¶ 33} In December 2018, Crawford also began occupational therapy on her hands, with the goal of being able to comb her hair and open doors without pain. Physical findings were made, including first compartment tenderness on the right hand, pain on the ulnar side of the left hand, mostly in the IV compartment, and right-hand weakness in grip and strength.    Crawford was given a splint and was scheduled for more therapy.    AmFam000522.    During treatment, Crawford continued to wear the splint and experienced a decrease in pain.    By the time treatment ended at Crawford's request on February 26, 2019, she was independent with "ADL and work tasks," was to continue to wear the splint as needed, and was to see a hand surgeon if problems persisted.    *Id.* at 001327-001334.

{¶ 34} On April 18, 2019, Crawford's attorney, Matthew Bruder, sent Dooley a settlement package.    The settlement summary included $23,208.01 in medical expenses and $235 in lost wages, and the demand was for $25,000 (the policy limits).    Among other things, the medical expenses included the $5,043.62 emergency room bill from MVH.    AmFam 000201 and 000206; Dooley Depo. at 43-44.    After receiving the package, Dooley asked Bruder for the MVH therapy records from February 11 through February 26, 2019, as they had not been included.    Bruder sent the records to Dooley, along with a letter, on May 22, 2019.    AmFam 001299-001300.    In addition, Bruder included Anthem's $1, 243 medical lien for the MVH emergency room treatment.    In this regard, Bruder stated in the letter:

I have also attached the medical lien we received from Anthem relative to this matter. Medical expenses, which are clearly a part of a reasonable good faith evaluation, can be evaluated based on the billed amount, the paid amount or any amount in between. The goal is to determine whether the billed amount, the paid amount or amount in between would reflect a reasonable cost for the services rendered. Thus, an evaluation for Leslie's claim would either consider medical expenses in the amount of $22,409.34 which was billed or $17,088.43 which was paid by Leslie, her health insurance carrier, and through medical payments coverage. Obviously, American Family could also run these bills through its medical bill review software to determine what a usual and customary charge would be for the services in this geographical area. Certainly, just deciding to always use the lowest number would be in the company's best interest if the company desired to offer as little an offer as could be justifiable. To the contrary, accepting the billed amount as the reasonable cost of medical expenses is both permitted by the presumption available under statute in Ohio and would be of the most benefit to your insured in allowing a justification of a higher payout

AmFam001300. At that point, AFIC had paid only $920.65 of the total $10,000 available med-pay coverage. *Id*.

{¶ 35} On June 24, 2019, Dooley made a settlement offer of $21,622.51. This included medical specials of $18,307.26, minus the current med-pay offset of $920.65,

for total medical specials of $17,386.61. Dooley then added $235.90 in wage loss and $4,000 in general damages. *Id.* at 1338.[1] When Dooley made this offer, his settlement range reserve was $$21,620 to $22,622, which included a range of $4,000 to $5,000 for pain and suffering. The range was based on Dooley's September 2018 interview with Crawford (which he had not updated), and his review of the accident report, vehicle damage, and medical records and bills. Dooley Depo. at 63.

{¶ 36} Dooley calculated the reserve on Crawford's claim by using Casualty Caddy Injury Reserve Template, which was a tool AFIC used to set reserves or adjust reserves on claim files. For this purpose, Dooley inputted: "chest, right ankle/knee, left hand contusion/soft tissue" into the caddy and also typed in "possible 16 to 18 weeks soft tissue injuries." During his deposition, Dooley stated that Crawford's first treatment was on August 10, 2018, and her last treatment was on February 26, 2019. However, he could not recall why he used the 16-18 week figure as opposed to the 30-week figure Crawford's attorney calculated. *Id.* at 64-65 and 69-70.[2]

{¶ 37} On June 27, 2019, Bruder replied to the offer, questioning the accuracy of the medical expense amount. In addition, Bruder asked Dooley to discuss with Crawford the six months of treatment she had undergone and the impact the accident had had on her life. AmFam001913. Dooley replied the same day, noting, in particular, that he had used a $1,172 figure for the $5,043.62 amount that MVH had originally billed for the emergency room treatment. Dooley also suggested having a phone interview with

---

[1] The various offers reveal a few pennies difference in the amount of medical expenses quoted by Dooley, but this is irrelevant for purposes of our review.

[2] The time frame for the dates in question is about 28-and-a-half weeks.

Crawford due to logistics. (He did not live in Ohio.)   *Id.* at 001915-001916.

{¶ 38} In early July 2019, AFIC's med-pay adjuster paid the remaining amount of the $10,000 med-pay coverage.   Of relevance here, on July 9, 2019, the adjuster paid MVH $4,239.46 for the emergency room charges incurred on the date of Crawford's accident.   This was the "allowed" amount of the original $5,043.62 bill.   *See* AmFam 001216-001220.   On July 9, the med-pay adjuster also notified Crawford's attorneys that med-pay benefits had been exhausted.   *Id.* at 001221.   Thereafter, this adjuster rejected a number of previously-submitted medical bills for that reason.   *E.g.*, *id.* at 001149-001153.

{¶ 39} On July 30, 2019, Dooley conducted another recorded interview of Crawford, this time with her attorney present.   During the interview, Crawford discussed the accident and its immediate impact, as well as continuing issues she had with her ankle and hands even after therapy had ended.   AmFam000120-000129.   On August 6, 2019, Bruder contacted Dooley to inquire whether Dooley had been able to reevaluate his offer. Dooley responded the next day with a total offer of $13,543.80.   This offer included: allowed medical specials of $8,307.90 (after offsetting the $10,000 in payments under the med-pay coverage); wage loss of $235.90; and $5,000 in general damages.   *Id.* at 001904-1905; *see also* Dooley Depo. at 77.   While this offer was $1,000 more than Dooley's prior offer for general damages, it was within the original evaluation of general damages, and Dooley had not changed his evaluation value.   *Id.* at 77-78.   The total amount allotted for medical expenses remained the same as before.   The only difference was that more money (the total $10,000 med-pay amount) was deducted.

**{¶ 40}** On October 18, 2019, another attorney from Crawford's law firm (John Smalley) contacted Dooley to indicate the matter had been referred to him for the purpose of filing litigation. Smalley rejected Dooley's August 6 offer, stating it was without reasonable justification, and requested the $25,000 policy limits. Dooley apparently did not respond. On December 5, 2019, Smalley resent the letter to Dooley and inquired what further information or investigation would be helpful. In response, Dooley increased the offer on December 6 by $1,000, to $14,543.80. Dooley sent a further email that day saying he did not need additional information. *See* AmFam001901-001903. On December 11, 2019, Smalley sent a letter to Dooley in a final attempt to avoid litigation. *Id.* at 000590-000591.

**{¶ 41}** In the December 11 letter, Smalley made a number of remarks about Dooley's conduct, including Dooley's method of calculating the amount of medical expenses. Specifically, after commenting about alternative methods for valuation, Smalley stated:

> In this case, the billed amount of medical expenses is $22,377.34. According to your analysis which gave rise to your initial offer on June 24, you accepted $18,307.26 as the reasonable cost of medical expenses. In determining the number to be used as the reasonable value of care, you chose to accept $1,172.00 as the reasonable cost of the emergency room bill at Miami Valley Hospital on August 10, 2018. This is what was paid on the bill by the client's health insurer.[3] However thereafter, this bill was sent

---

[3] Anthem's lien was slightly higher at $1,243, but the discrepancy is not relevant for purposes of this appeal. Both sides referenced the $1,172 amount in discussing

to American Family for evaluation pursuant to your client's medical payments coverage. Your Medical Payments Department apparently ran this bill through the building [sic] review service and determined that the reasonable charge for this service was $4,239.46. The Medical Payments Review Department assumedly used the medical billing review service that the company accesses routinely to evaluate bills in the med pay department. The medical payments department approved the billed amount as the reasonable cost of rendered medical care and paid this amount pursuant to the medical payments coverage of the insured's policy. Then, when you re-evaluated the case following additional medical payments being made, you again determined that the reasonable value of medical expenses was still $18,307.20. Keeping this number as the reasonable cost ignores what the company's own medical bill review service determined the reasonable cost of the emergency room bill to have been. Being objective about the case, the reasonable value of your medical expenses should have been re-calculated to include that amount which was determined by your Medical Payments Department with the conclusion that reasonable medical expenses were in the total amount of $21,374.02. Unfortunately, you continued to use the smallest amount possible to value medical expenses by focusing on the Anthem payment rather than the greater valuation given by your Med Pay Department. Then, to compound

---

settlement figures.

the problem, you reduced your UIM offer by the full $10,000 in medical payments coverage so you are reducing the amount of your evaluation by the amount of the emergency room bill that you didn't even find to be reasonable itself in your initial evaluation.

(Footnote added.)   AmFam000590.

{¶ 42} After commenting on other issues about the valuation, Smalley stated that he would not further reduce the prior request for $25,000, and that if Dooley were content that AFIC had made a final good-faith offer, he would tell Crawford she had no alternative but to file suit.   *Id.* at 000591.   Dooley's response was that he believed a good-faith offer had been made, and he reiterated the $14,543 offer.   *Id.* at 001340.   Smalley then sent Dooley a courtesy copy of the lawsuit on December 16, 2019, which included bad faith claims and a request for punitive damages.   *Id.* at 000594-000598.   As indicated, the lawsuit was filed on December 16.

{¶ 43} During his deposition, Dooley stated that under both med pay and UM coverage, AFIC adjusters owe the reasonable cost of necessary medical expenses.   He explained that to calculate these expenses, AFIC uses a tool called Decision Point, where adjusters "plug in" a bill and come up with reasonable and customary expenses. Decision Point is a software program which can decide things based on a provider's location, what is an average or reasonable amount of costs in that area, and whether the codes are being billed properly in conjunction with each other.   The program then uses an 85% rate of what providers in the area are charging.   Dooley Depo. at 15-19.   Dooley noted that the med-pay department had used Decision Point to calculate the MVH

emergency room bill on Crawford's claim. *Id.* at 54-55.

**{¶ 44}** According to Dooley, in considering the reasonable cost of medical expenses incurred, he could consider the billed cost of emergency services in this case, which was $5,043.62, or the amount arrived at by Decision Point, which was $4,239.46, or the amount that was paid by Anthem plus copays and deductibles. *Id.* at 57. Dooley chose the lowest of these three numbers and then took an offset for the total $10,000 that med-pay had paid on the claim. *Id.* at 58. In this context, the following exchange occurred:

> Q. Okay. So if we assume that that $10,000 was paid with an allocation of $4,239.46 to the ER, you are giving a value of only a thousand and change to the bill but taking a credit of 4,000 and change against your value. Do you understand my point, Mr. Dooley?
>
> . . .
>
> A. I understand.
>
> Q. Okay. When you valued the claim, why didn't you use the billed amount, which would certainly be better for your insured and increase your evaluation?
>
> A. I used the lower amount of what was paid by the health insurer and what was adjusted off because I was allowed to use it.

Dooley Depo. at 58-59.

**{¶ 45}** The following further exchange also occurred during Dooley's deposition:

> Q. . . . Now, the issue with regard to how much the emergency room

was valued by Med-Pay versus what you had valued it as is relevant because you're taking an offset against what Med-Pay paid against a lesser value that you use.

Do you understand what I'm saying, Mr. Dooley, or is that not understandable to you?

. . .

A. I only understand that $10,000 was paid out on the medical specials that were submitted, and in my evaluation I took the offset on those medical bills.

Q. Yeah. But you're taking an offset of $4,300 against a bill that you only valued at $1,200. Do you understand that?

. . .

A. No, sir, I don't.

Q. All right. This same issue, you understand that I brought it up to you in a letter, don't you?

A. Yes, I recall you brought it up in a letter.

Q. Did you send me a letter to me and say, Mr. Smalley, I don't understand?

. . .

A. No, sir, I didn't send you a letter stating that I didn't understand.

Q. No, you didn't.

You agree that it's your responsibility to treat your insured

fairly, don't you, Mr. Dooley?

> A. Yes, sir, I do.

Dooley Depo. at 78-79.

**{¶ 46}** As noted, Crawford argues that Dooley's conduct creates a genuine issue of material fact concerning whether AFIC acted in bad faith in processing her claim. We agree. In its decision, the trial court stated that "although the parties clearly disagree as to the value of Plaintiff's claim, the language of the policy, as well as the records regarding Plaintiff's treatment and injuries, provides a reasonable justification for Defendant's evaluation of the claim, and does not constitute arbitrary or capricious conduct on the part of Defendant." Decision at p. 5.

**{¶ 47}** There is no question that the policy provisions allowed Dooley to offset payments under med-pay coverage against what was ultimately paid to Crawford under the UM provision. However, that is all the policy says; it says nothing about the procedure used here, which was: (1) to disregard the reasonable valuation of the same expense that another adjuster arrived at by using the company's software; (2) use the lowest possible number for the same expense; and (3) offset the higher amount from the amount to be paid on the insured's UM claim. The trial court did not consider these facts.

**{¶ 48}** Dooley was an experienced insurance adjuster. When Dooley made the offer to Crawford, he had been working as an adjuster handling bodily injury claims for nearly 20 years, almost all of that time with AFIC. Dooley Depo. at 6 and 9. Dooley had also been handling UM claims for AFIC since around 2002 and had handled claims in Ohio since 2011-2012. In addition, he had received training in bad faith. *Id.* at 11-12.

Under the circumstances, Dooley's professed lack of understanding about the effect of his actions is inexplicable. Furthermore, Dooley's assertion that he used a lower value because he could do so lacks any sound reasoning and is arbitrary.

**{¶ 49}** While the amount differential is not substantial (i.e., $4.329 minus $1,172 equals $3,157), that has nothing to do with whether bad faith existed. For example, at the time of his deposition, Dooley had about 137 open injury claims. *Id.* at 24. Assuming for the sake of argument that Dooley followed the same approach on these claims and reduction amounts were similar, that would result in about $432,509 of underpayment. Of course, this amount could have been greater. For example, in a situation where an insured had $100,000 in UM coverage and a larger med-pay amount, a discrepancy could be quite large. Furthermore, Crawford's attorney explained in detail in the December 11, 2019 letter why Dooley's method was inappropriate, but Dooley ignored this.

**{¶ 50}** In remanding this case previously, we included statements that we found "instructive concerning the difference between summary judgment consideration and trial in bad faith cases." *Crawford*, 2023-Ohio-1069, at ¶ 44. In this regard, we quoted from another case, in which the court of appeals had said:

> Although Colonial [the insurer] presents various good points in support of its position, this court concludes judgment cannot be granted as a matter of law in this case. As to the "fairly debatable" precedent, the case does not merely state: "Where a claim is fairly debatable the insurer is entitled to refuse the claim * * *;" the law continues: "as long as such refusal is

premised on a genuine dispute over either the status of the law at the time of the denial or the facts giving rise to the claim." *Motorists Mut. Ins. Co. v. Said*, 63 Ohio St.3d 690, 700 . . . (1992). A failure to reasonably investigate before arriving at a legal or factual position can give rise to liability. *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 554 . . . (1994) (finding evidence from which the jury could conclude the insurer failed to conduct an adequate investigation on cause of fire and was not reasonably justified in denying the insured's claim).

Furthermore, the applicable test for a judge or jury to apply at trial is not purely applicable at the summary judgment stage. The ultimate issue for trial is whether the insurer's handling of the claim or refusal to pay the claim was done in good faith, meaning whether it was "predicated upon circumstances that furnish reasonable justification therefor." *Zoppo*, 71 Ohio St.3d at 554 . . . At the summary judgment stage, the issue is not whether Colonial proved it handled the claim in good faith and had reasonable justification for its conduct throughout the handling of its insured's claim.

If the insured moved for summary judgment, the issue would be whether some reasonable mind could find the insurer did not handle the claim in good faith, i.e. whether some reasonable mind could find the insurer's conduct was not reasonably justified. *See* Civ.R. 56(C). Surely, reasonable minds could find the claim was fairly debatable and the refusal

was premised on a genuine dispute over either the status of the law at the time of the denial or the facts giving rise to the claim. However, Appellant [the insured] was not seeking summary judgment; he was the non-movant.

Considering the combination of acts and omissions, it cannot be said the record is devoid of any evidence tending to show a lack of good faith. *See, e.g., Mentor Chiropractic Ctr., Inc. v. State Farm Fire & Cas. Co.*, 139 Ohio App.3d 407, 411, . . . (11th Dist.2000) ("Summary judgment is appropriately granted to the defendant on a claim of bad faith where the record is devoid of any evidence tending to show a lack of good faith on the part of the defendant."). Even if certain circumstances would not individually qualify as bad faith conduct, the overall circumstances are relevant and must be viewed in the light most favorable to Appellant.

Rational inferences must be drawn and doubts must be resolved in Appellant's favor. *See, e.g., Jackson v. Columbus*, 117 Ohio St.3d 328, 2008-Ohio-1041, . . . ¶ 11; *Leibreich v. A.J. Refrig., Inc.*, 67 Ohio St.3d 266, 269, . . . (1993); *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 121, . . . (1980) (a court "may not weigh the proof or choose among reasonable inferences."). Upon doing so, this court concludes some rational trier of fact could find a lack of good faith in some aspects of Colonial's claim handling in this case.

*Crawford*, 2023-Ohio-1069, at ¶ 44, quoting *Marshall v. Colonial Ins. Co.*, 2016-Ohio-8155, ¶ 80-84 (7th Dist.).

{¶ 51} Contrary to AFIC's contention, the dispute here is not just a disagreement about the claim's value; instead, a rational trier of fact could find there was no reasonable justification and a lack of good faith in some aspects of Dooley's handling of this case. Along with the acts we have already discussed is the fact, as noted by Crawford, that Dooley used a 16-18 week figure in calculating general damages. Dooley's testimony on this point was equally devoid of sound or explicable reasoning. As we indicated earlier, Dooley stated the treatment period was August 10, 2018, to February 26, 2019 (a period of more than 28 weeks). However, Dooley inputted 16 to 18 weeks into the company's software and could not recall why he used the lower amount. Dooley Depo. at 64-65 and 69-70. Obviously, this would result in a lower reserve and calculation of damages. Thus, this is not a disagreement over the value of the claim; it is an issue with the method of calculation used. Again, a reasonable trier of fact could find a lack of good faith on this point. Accordingly, Crawford's assignment of error has merit.

{¶ 52} In responding to Crawford's arguments, AFIC has also asked us to affirm the trial court's judgment as to the punitive damages claim because there was no evidence AFIC acted fraudulently or with actual malice. AFIC Brief at p. 14. According to Crawford, there are genuine issues of material fact concerning whether Dooley acted with actual malice or fraud. The trial court did not discuss punitive damages, other than dismissing that claim because of its conclusion that AFIC did not act in bad faith. Decision at p. 5. Nonetheless, we will consider the issue, since this case was filed nearly five years ago and has now been before our court twice. The parties have also briefed the issue.

{¶ 53} "The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct." *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 651 (1994). "Punitive damages may be recovered against an insurer [that] breaches [its] duty of good faith in refusing to pay a claim of its insured upon proof of actual malice, fraud or insult on the part of the insurer." (Brackets in original.) *Staff Builders*, 37 Ohio St.3d 298, at paragraph two of the syllabus, *approving and following Hoskins*, 6 Ohio St.3d 272. *See also Dardinger v. Anthem Blue Cross & Blue Shield*, 2002-Ohio-7113, ¶ 174-190 (affirming punitive damages award against insurer for conduct in claims handling but ordering remitter of award from $49 million to $30 million).

{¶ 54} "Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St.3d 334 (1987), paragraph two of the syllabus. *Accord Zoppo*, 71 Ohio St.3d at 558; *Sivit v. Village Green of Beachwood, L.P.*, 2015-Ohio-1193, ¶ 7. This is not a conjunctive requirement; the disregard can be for either rights or safety. *Chapel v. Wheeler Growth Co.*, 2023-Ohio-3988, ¶ 12 (1st Dist.) (discussing *Preston's* own clarification of this point at page 336 of its decision). " 'Actual malice is necessary for an award of punitive damages, but actual malice is not limited to cases where the defendant can be shown to have had an "evil mind." ' " *Buckeye Union Ins. Co. v. New England Ins. Co.*, 87 Ohio St.3d 280, 286 (1999), quoting *Cabe v. Lunich*, 70 Ohio St.3d 598, 601 (1994). "The presence of actual malice need not be expressed but 'may be inferred from conduct and

surrounding circumstances.' " *Staff Builders* at 304, quoting *Columbus Finance, Inc. v. Howard*, 42 Ohio St.2d 178, 184 (1975).

**{¶ 55}** In light of our previous discussion, we agree with Crawford that genuine issues of material fact exist regarding the punitive damages issue. Dooley need not have had an "evil mind," but there are genuine issues of material fact concerning whether his conduct showed a conscious disregard for Crawford's rights with a great probability of causing substantial harm. That issue should not be decided on summary judgment.

**{¶ 56}** Based on the preceding discussion, Crawford's sole assignment of error is sustained.

### III. Conclusion

**{¶ 57}** Crawford's sole assignment of error having been sustained, the judgment of the trial court is reversed, and this cause is remanded for further proceedings.

. . . . . . . . . . . .

LEWIS, J. and HUFFMAN, J., concur.